808 P.2d 1243

**SDC MANAGEMENT, INC., a California Corporation, and Shopping Center Ventures, Inc., a California Corporation, Plaintiffs–Appellees,**

v.

**STATE of Arizona, ex rel. ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellant.**

**No. 1 CA–CV 88–597.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 8, 1991.

Review Denied May 7, 1991.

Mohr, Hackett, Pederson, Blakely, Randolph & Haga, P.C. by Arthur W. Pederson and Peter N. Spiller, Phoenix, for plaintiffs-appellees.

Robert K. Corbin, Atty. Gen. by Sandra B. Kelley, Asst. Atty. Gen., Phoenix, for defendant-appellant.

## OPINION

JACOBSON, Judge.

The Arizona Department of Revenue (Department) appeals from summary judgment entered in favor of SDC Management, Inc. and Shopping Center Ventures, Inc. (taxpayers) in their actions for a refund of transaction privilege taxes calculated on 16 sales of improved real property. The following issues are raised on appeal:

(1) By engaging independent, licensed general contractors to construct improvements on their property, did the taxpayers operate:

(a) prior to January 1, 1979, as a "contractor" under former A.R.S. §§ 42–1301(3) and –1310(2)(i); and/or

(b) after December 31, 1978, as an "owner-builder" under former A.R.S. §§ 42–1301(9) and –1310(2)(j)?

(2) Did the trial court err in awarding attorneys' fees against the Department at rates in excess of $75 per hour?

For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

SDC Management, Inc. (SDC) and Shopping Center Ventures, Inc. (SCV) are California corporations. SCV was organized to facilitate market penetration in Arizona of Alpha Beta Supermarkets. Prior to 1981 Alpha Beta owned 55% of SCV's stock. SCV has never had any employees who either worked or resided in Arizona. SDC has two employees who reside in Arizona, a real estate broker and a secretary. The taxpayers have never been licensed to perform construction in Arizona or any other state. The taxpayers separately purchased parcels of real property in Arizona. Thereafter, the taxpayers engaged independent architects to prepare plans and specifications for improvements on these parcels and independent general contractors to perform the construction pursuant to the architects' plans and specifications. Building permits on each project were requested by

and issued to the general contractors. Pursuant to the contracts, each general contractor paid state transaction privilege taxes due on the construction income received from the taxpayers.

Neither taxpayer contracted directly with subcontractors. Neither made any agreements with any third-party buyer for the construction of improvements on any parcel, and neither sold any parcel at issue during any phase of construction. Each parcel of property was used by each taxpayer prior to its sale to generate rental income, and no tenant of either taxpayer was given an option to buy the leased property. The taxpayers subsequently sold 16 parcels of real property, as improved.

The Department assessed transaction privilege taxes on the gross income derived from the 16 sales of improved real property made by the taxpayers during two audit periods from July 1, 1977 through April 30, 1984. The Department taxed the proceeds from the sales of improvements built under contracts executed before January 1, 1979 as gross income from the business of "contracting," pursuant to former A.R.S. §§ 42–1301(2) and 42–1310(2)(i). It also taxed the proceeds from the sales of improvements built under contracts executed after December 31, 1978 as gross income from the business of "operating as an owner-builder," pursuant to former A.R.S. §§ 42–1301(9) and 42–1310(2)(j).[1]

The taxpayers protested these assessments, exhausted their administrative remedies, and paid the assessed taxes under protest. In September 1987, the taxpayers filed the instant actions for recovery of the amounts paid, pursuant to A.R.S. § 42–124(B)(2). The taxpayers subsequently moved for summary judgment, arguing that they had not acted as "contractors" or "owner-builders" within the meaning of the relevant statutes. The trial court granted the taxpayers' motion, as well as the taxpayers' request for attorneys' fees against the Department in excess of $75 per hour. See A.R.S. § 12–348(D)(2). The Department timely appealed.

## PRE–1979: TAXABILITY AS A "CONTRACTOR"

Until it was amended in 1978, A.R.S. § 42–1310 provided, in part:

The tax imposed by subsection A of § 42–1309 shall be levied and collected at the following rates:

. . . .

2. At an amount equal to one per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the following businesses:

. . . .

(i) Contracting, but the sale price of land which shall not exceed the fair market value and the payments paid by the contractor for labor employed in construction, improvements or repairs shall not be subject to such tax.

At all times relevant to this litigation, A.R.S. § 42–1301 provided, in pertinent part:

2. "Contracting" means engaging in business as a contractor.

3. "Contractor" is synonymous with the term "builder" and means a person, firm, partnership, corporation, association or other organization, or a combination of any of them, who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, *or does himself or by or through others*, construct, alter, repair, add to, subtract from, improve, move, wreck, or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structure or works in connection therewith, and includes subcontractors and specialty contractors. For all purposes of taxation or deduction, this definition shall govern without regard to whether or not the contractor is acting in fulfillment of a contract.

(Emphasis added.)

The Department argues that an owner who hires a general contractor to construct

---

1. Unless otherwise indicated, all statutory references in this opinion are to sections in effect during the two audit periods out of which this litigation arose.

improvements on his real property "under-takes" construction "by or through others," thus meeting the statutory definition of "contractor." Therefore, the Department argues, an owner who thereafter sells the property is liable for transaction privilege taxes assessed against the proceeds from the sale of improvements constructed under pre–1979 contracts as gross income from the business of "contracting."

We begin this analysis by reviewing the previous statutory history and judicial interpretation of the relevant statutes. In 1937, a transaction privilege tax was specifically imposed on "the business of contracting," but neither contractor nor contracting was defined. Laws 1937, 1st Spec.Sess., ch. 2. The Arizona Supreme Court considered the scope of this tax in *Moore v. Smotkin*, 79 Ariz. 77, 283 P.2d 1029 (1955). In that case, the taxpayers purchased tracts of land and improved them by laying streets, water, gas, and electric conduits. The taxpayers then divided the tracts into lots, constructed houses on the lots, and sold the houses and lots as integral units. The State Tax Commission assessed transaction privilege taxes against the taxpayers on the theory that they were engaged in the business of "contracting." On appeal from a judgment for the taxpayers, the supreme court held:

> Our examination of the authorities leads us to the conclusion that there is a thread common to all definitions of "contract", "contracting" and "contractor" which can best be stated to be that it takes at least two parties to establish a contractual relationship; that one person must agree with another. To be a contractor one person must have entered into an agreement with another to perform work for the other. We believe that this compels the conclusion that one cannot be in the business of contracting without first having entered into a contractual relation with another by which the contractor undertakes to erect buildings or in some manner to improve property or construct works.

79 Ariz. at 80, 283 P.2d at 1031. The court concluded:

> We believe that the meaning of the term "business of contracting" is so well established and understood that it *cannot be said to encompass owners who construct buildings or other improvements on their own property.*

*Id.* at 82, 283 P.2d at 1032 (emphasis added).

Following *Moore v. Smotkin*, the legislature amended a portion of the transaction privilege tax scheme by providing that there was exempt from the tax "[s]ales of tangible personal property to a person licensed as a contractor under Chapter 10 of Title 32...." *See* A.R.S. § 42–1321(A)(3) (1956). The definition of contractor under Chapter 10 of Title 32 (dealing with the licensure of contractors) included one who "does himself or by or through others, construct...." *See* former A.R.S. § 32–1101. This amendment was interpreted in *Arizona State Tax Commission v. Staggs Realty Corp.*, 85 Ariz. 294, 337 P.2d 281 (1959). In that case, the taxpayer, Staggs Realty, purchased land and subdivided it into lots, installing paving, curbs, and sewerage and water mains where required. Staggs Realty would also plan homes to be constructed on the lots, and then enter into contracts with Staggs Construction Company, a related but independent corporation, under which Staggs Construction would build the planned homes at agreed prices. After obtaining mortgage financing, Staggs Realty would finally sell the homes and lots to the public. The State Tax Commission assessed transaction privilege taxes against Staggs Realty on the theory that it engaged in the business of "contracting." Staggs Realty paid the assessment under protest, and successfully recovered a judgment against the Commission for a refund. *Id.* at 295, 337 P.2d at 282.

On appeal, the Commission contended that *Moore v. Smotkin* no longer applied, arguing that the tax exemption statute's cross-reference to the contractor licensing provisions indicated that the two statutes were *in pari materia*, and that assessment of the transaction privilege tax was thereby proper against all who were defined as

"contractors" in the licensing statute. *Id.* at 296–97, 337 P.2d at 283.

While agreeing that the contractor licensing statute defined "contractor" more broadly than *Moore v. Smotkin,* the supreme court disagreed that the licensing and transaction privilege tax statutes were *in pari materia.* The court noted that the words of the taxing statute had not been substantively altered since *Moore v. Smotkin,* and further that the implication for which the Commission argued was not readily apparent from a reading of the tax exemption for sales to licensed contractors. *Id.* at 297, 337 P.2d at 283. Consequently, the court found *Moore v. Smotkin* controlling:

> Keeping in mind that appellant seeks imposition of the tax on appellee's sales proceeds, the dominant fact of comparison is that both Smotkin and appellee were speculative builders of tract houses (appellee contracting with an affiliated company to have the affiliate perform the home construction), both building to their own design on their own property in accordance with an overall production plan of their own making, and both selling or promising to sell lot and house units.

*Id.* at 299, 337 P.2d at 284–85.

In its session immediately following the *Staggs Realty* decision, the legislature adopted the definitions of "contractor" and "contracting" that are before us in the present case, repeatedly referring to this legislation as "clarifying exemptions of speculative builders from sales tax." Laws 1960, ch. 21, § 1; 1960 Journal of the Senate at 99, 135, 160, 168, 175, 353, 437; 1960 Journal of the House at 223.

For clarification, the definition of "contractor" for purposes of the transaction privilege tax includes one who "does himself or by or through others, construct," and it also provides that "[f]or all purposes of taxation or deduction, this definition shall govern without regard to whether or not the contractor is acting in fulfillment of a contract." A.R.S. § 42–1301(3).

It is clear that the pre–1979 statutory definition of "contracting" was intended to embrace those who are classified as "contractors" under the statutory licensing requirements. *See* A.R.S. § 32–1101. Thus, it can be assumed that *Staggs Realty,* which held that the licensing statute and the transaction privilege tax statute were not *in pari materia,* has been legislatively overruled. It remains to be seen whether this definition of "contractors" encompasses the taxpayers here.

To make this determination, two additional cases must be analyzed. The first is *Bassett v. City of Tucson,* 137 Ariz. 199, 669 P.2d 976 (App.1983). In that case, the taxpayers contracted with a general contractor to build a shopping center on a parcel of real property that they had recently purchased. Those taxpayers subsequently sold the shopping center approximately a year after its completion. The City of Tucson assessed its business privilege tax on the gross proceeds of the sale on the basis that the taxpayers were "speculative builders." *Id.* at 200, 669 P.2d at 977. The Tucson City Code contained a definition of "contractor" similar to A.R.S. § 42–1301(3), and in addition provided, in part:

> Sec. 19–39.1(3). *Owner-builder.* "Owner-builder" means a person who owns or leases real property within the city, and who acts as a contractor, either himself or through others, in constructing any improvement upon the real property, which real property as improved is held by such person for his use or for rental purposes.
>
> . . . .
>
> Sec. 19–39.1(6). *Speculative builder.* "Speculative builder" means an owner-builder, as defined in § 19–39.1(3), who sells the completed project within twenty-four (24) months after its completion date.

*Id.* The *Bassett* court held that the taxpayers "undertook" construction "by or through others," and that the taxpayers sold this property within 24 months of construction. Under the clear language of the Code, the taxpayers were well within the definition of "speculative builder" and, as

such, were subject to taxation. *Id.* at 202, 669 P.2d at 979.

The Tucson City Code was clearly directed toward the taxation of the business of contracting as that business is defined in the taxing ordinances. The City of Tucson accomplished this by imposing the tax on two classes of taxpayers: (1) those taxpayers who do actual construction for others;[2] and (2) those who are owner-builders but who become subject to the tax by selling the improvements within 24 months of construction. That the Tucson tax was directed to the taxable event of contracting is made clear by the distinction the Code makes between owner-builders who are not subject to the tax and "speculative" owners-builders who are. Tucson City Code Sec. 19–83(7) provided:

> Owner-builders shall not be liable for the [transaction privilege tax] ... with respect to improvements constructed for their own use, or for rental purposes, and they shall be considered as retail purchasers of materials purchased and incorporated into such improvements; provided, however, that an owner-builder who sells such improvement at any time within twenty-four (24) months after the improvement is substantially completed ... become speculative builders and shall be taxed as [prime] contractors.

*Bassett,* 137 Ariz. at 200–01, 669 P.2d at 977–78.

Moreover, under the Tucson City Code, the owner-builder who becomes a "speculative builder" and thus taxed as a general contractor was entitled to credit against his tax liability for taxes paid by the previous general contractors and taxes previously paid by the owner-builder on materials incorporated into the improvements sold. Tucson City Code Sec. 19–83(7). Thus, the Tucson City Code avoided double taxation of the same transaction and put the speculative builder on the same tax footing as the original general contractor.

This detailed analysis of *Bassett* is necessary at this juncture because of the discussion of that case in *City of Phoenix v. Santa Anita Development Corp.,* 141 Ariz. 179, 685 P.2d 1331 (App.1984). *City of Phoenix* dealt with the City's attempt to impose its privilege license tax on the same taxpayers involved in this case. Section 14–1 of the Phoenix City Code defined "contractor" as follows:

> ... A person who, for either a fixed sum, price, fee, percentage, bonus or other compensation other than actual wages, undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. The term "contractor" includes subcontractors, specialty contractors, developers and speculative builders.

*Id.* at 180, 685 P.2d at 1332. The court made two observations concerning the Phoenix City Code definition of "contractor": (1) that there was no evidence that the taxpayers received a "fixed sum, price, fee, percentage, bonus or other compensation other than actual wages [to] ... construct," and (2) that there was absent from the City Code any definition dispensing with the *Moore v. Smotkin* requirement that a "contractor" act in fulfillment of a contract. *Id.* at 182–83, 685 P.2d at 1334–35. Thus, the court held that the taxpayers were not "contractors" within the meaning of the Phoenix City Code. *Id.* at 183, 685 P.2d at 1335.

What makes this case pertinent to our discussion is its attempt to distinguish the Phoenix tax from the Tucson tax analyzed in *Bassett.* In doing so, the *City of Phoenix* court stated:

---

**2.** This conclusion is reached because the definition provides that "contractor is synonymous with builder," and the definition of "contractors" as contained in the licensing statutes is incorporated. For purposes of this opinion, we will refer to these types of taxpayers as "general contractors."

One such difference is the inclusion in the Tucson ordinance of critical language found also in A.R.S. § 42–1301(4), but not in the City of Phoenix ordinance. The referred-to language is: "For all purposes of taxation or deductions, this definition [of "contractor"] shall govern without regard to whether or not the contractor is acting in fulfillment of a contract." § 19–39.1(2), Tucson City Code. As we mentioned earlier in discussing the state statute, we give considerable weight to the fact that the quoted language was not included in the Phoenix City Code in effect prior to January 1, 1978. *The quoted language goes directly to the question of tax liability in the present case.* The quoted language clearly supports the imposition of the contracting tax where the owner-developer improves real property on a speculative basis.

*Id.* (emphasis added).[3]

It is therefore argued that, if the Phoenix City Code had contained the omitted language, the result reached in *Bassett* would have been applied, and that because A.R.S. § 42–1301(3) contains this language, *Bassett* is applicable and the taxpayers' sales of the improved real property is taxable. While we agree that the distinction made in *City of Phoenix* exists, in our opinion this is not the controlling distinction. Rather, as pointed out earlier, the Tucson City Code is a comprehensive taxing package which swept into its reach "speculative builders" who became taxed as general contractors by the happening of a specific event—the sale of the improvements within 24 months.[4] What is inherent in both the Tucson and Phoenix City Codes is that the taxpayer must be a "contractor" in order to be subject to the tax. The Tucson City Code simply expanded that definition to include owner-builders who became "speculative builders" upon the happening of an event.

We therefore turn to the question whether the taxpayers here fall within the pre–1979 definition of "contractor." The Department's argument is rather straightforward: because the definition of contractor includes those who construct "through others," and because the taxpayers here obviously contracted with others to have construction performed, the taxpayers, by definition, must be contractors for the purpose of the transaction privilege tax. The problem with this argument is that under this interpretation everyone who ever "undertakes" construction must be a "contractor," for there is no way construction can occur unless performed individually or by others. The Department counters this argument by contending that only those in the "business" of contracting are included in this universal tax round-up.

■ In our opinion, the legislature did not intend everyone who ever decided to build to be included within the ambit of the transaction privilege tax. Rather, the legislative history reflects an intent to tax those who we might traditionally consider to be "contractors," that is, those who for a consideration undertake to build for others. This is the teaching of *Moore v. Smotkin, Staggs Realty,* and *City of Phoenix.*

■ While the reach of the pre–1979 definition might well include within its grasp those who are similar to the builders dealt with in *Staggs Realty,* we hold that taxpayers who employ independent general contractors to build do not themselves become contractors for the purpose of the transaction privilege tax.

**3.** The *City of Phoenix* court noted that the *Moore v. Smotkin* language was *added* in 1960 to the then existing definition of contractor in then § 42–1301(4). 141 Ariz. at 182–83, 685 P.2d at 1334–35. We believe that this statement is incorrect. As previously noted, no statutory definition existed at all for the term "contractor" until 1960. By Laws 1960, ch. 21, § 1, the Arizona legislature added as § 42–1301(5) the entire definition of "contractor," not merely the concluding sentence to which the *City of Phoenix* court referred.

**4.** *City of Phoenix* also notes: "Moreover, the Tucson Code, set forth fully in *Bassett,* spells out specifically that the tax is imposed upon an owner-builder who sells the completed project within twenty-four months after its completion." 141 Ariz. at 183–84, 685 P.2d at 1335–36.

## POST–1979: TAXABILITY AS AN "OWNER–BUILDER"

Statutory amendments to A.R.S. §§ 42–1301 and 42–1310 were enacted effective January 1, 1979 to eliminate the transaction privilege tax on the business of "contracting" and to impose the tax on the businesses of "prime contracting" and "operating as an owner-builder." Laws 1978, ch. 97, §§ 1, 2, 4, 5, 6. As amended, A.R.S. §§ 42–1310(2)(i) and (j) provided:

The tax imposed by subsection A of § 42–1309 shall be levied and collected at the following rates:

. . . .

2. In an amount equal to one per cent of the gross proceeds of sale or gross income from the business upon every person engaging or continuing within this state in the following businesses:

. . . .

(i) Prime contracting, but the sale price of land which shall not exceed the fair market value and an amount equal to thirty-five per cent of gross income or gross proceeds of sale in lieu of any labor employed in construction, improvements or repairs shall not be subject to such tax. Subcontractors or others who perform services in respect to any improvement, building, highway, road, railroad, excavation or other structure, project development or improvement shall not be subject to such tax if they can demonstrate that the job was within the control of a prime contractor or prime contractors and that such prime contractor is liable for such tax upon the gross income, gross proceeds of sale or gross receipts attributable to the job and from which the subcontractors or others were paid.

(j) Operating as an owner-builder, the purchase of tangible personal property for incorporation into any realty improvement, building, highway, road, railroad, excavation or other structure, project development or improvement, shall be subject to the tax computed on the sales price thereof, but the purchase of tangible personal property which sale has already been subjected to the tax imposed

under § 42–1312 shall be exempt from the tax. An owner-builder who sells such real property as improved at any time on or before the expiration of twenty-four months after the improvement is substantially completed, meaning suitable for the use or occupancy intended, shall be treated as a "prime contractor".

Laws 1978, ch. 97, § 2. In addition, A.R.S. §§ 42–1301(9), (11), and (12), as amended, provided:

9. "Owner-builder" means a person who owns or leases real property within the state, and who acts as a contractor, either himself or through others, in constructing any improvement upon the real property, which real property as improved is held by such person for his use or for rental purposes.

. . . .

11. "Prime contractor" means the contractor who supervises, performs or coordinates the construction, alteration, repair, addition, subtraction, improvement, movement, wreckage or demolition of any building, highway, road, railroad, excavation or other structure, project, development or improvement including the contracting, if any, with any subcontractors or specialty contractors and is responsible for the completion of the contract.

12. "Prime contracting" means engaging in business as a prime contractor.

Laws 1978, ch. 97, § 1.

As can be seen, these statutes track in some respects the Tucson City Code construed in *Bassett*. However, several major conceptual differences are present. First, as previously indicated, the Tucson City Code makes a clear distinction between owner-builders who construct for their own use or for rental and those who become "speculative builders" by selling within 24 months of construction. No such distinction exists under A.R.S. § 42–1301 *et seq.* Second, the Tucson City Code was consistent in its treatment of all "speculative builders," whether they built themselves or through a general contractor, by allowing tax credits so that double taxation did not

occur. The state statutes do not follow this scheme.

■ We therefore need to analyze these statutes with these differences in mind. As a threshold matter, an "owner-builder" under the statute is one "who acts as a contractor...." A.R.S. § 42–1301(9). Because we have held above that the taxpayers did not act as "contractors" in improving their own real property through general contractors, it follows that the taxpayers did not act as "owner-builders" under the present facts.

Moreover, we believe that the post–1979 statutory scheme is even more indicative than the pre–1979 scheme of the legislature's intent not to subject owners of improved real property to transaction privilege taxes in this type of case. A general contractor who works for an owner-builder is itself taxed as a "prime contractor." *See* A.R.S. § 42–1310(2)(i). According to the Department, if the owner-builder then sells the improvement within two years, the owner-builder becomes subject to the tax and the general contractor becomes a nontaxable subcontractor entitled to a refund of the tax it has paid.

■ The flaw in this argument, however, is that there is no statutory authority for the proposition that the general contractor suddenly ceases to be the prime contractor upon later sale of the improvement. A subcontractor is not subject to the tax if it can demonstrate:

... that the job was within the control of a prime contractor ... and that such prime contractor is liable for such tax upon the gross income, gross proceeds of sale or gross receipts attributable to the job and from which the subcontractors or others were paid.

A.R.S. § 42–1310(2)(i). A general contractor who works directly for an owner simply does not fit within this statutory exemption upon a subsequent sale by the owner. The general contractor is the prime contractor at the time it owes the transaction privilege tax because the job is not within the control of another who satisfies the definition of prime contractor. Additionally, the general contractor has not been paid out of the receipts on which the owner-builder is now deemed to be taxed.

We also note that each general contractor in this case was contractually obligated to and did in fact pay transaction privilege taxes which were assessed against the construction income received from the taxpayers. In this regard, the Department argues that either the taxpayers will receive a credit for or the general contractors will be entitled to a refund of these amounts upon payment of the "contracting" tax by the taxpayers.

■ Unfortunately, unlike the Tucson City Code credits, the Department is unable to cite (and we are unable to find) any authority for either proposition. Although the Department asserts that the taxpayers here did in fact receive credit for amounts already paid by the general contractors, no provision exists for this anywhere in the transaction privilege tax statutory scheme. Moreover, a general contractor would not be entitled to a refund of taxes initially assessed under the semblance of authority, and therefore not paid under protest. *See* A.R.S. § 42–1339(B), repealed by Laws 1985, ch. 366, § 1 (eff. July 1, 1986).[5] Transaction privilege tax liability accrues on a monthly basis. *New Cornelia Co-op. Mercantile Co. v. Arizona State Tax Comm'n,* 23 Ariz.App. 324, 327, 533 P.2d 84, 87 (1975). In order for the general contractor to pay the tax under protest at the time it is owed, it would have to know that the taxpayers intended subsequently to sell the improved property. No statutory authority imputes such clairvoyant powers to the general contractor.

■ Thus, the very real possibility of double taxation rears its head upon contemplation of a scheme that taxes an owner subsequent to payment of that same tax by

---

**5.** *See Gosnell Dev. Corp. v. Arizona Dep't of Revenue,* 154 Ariz. 539, 744 P.2d 451 (App.1987) (taxpayer need not pay tax under protest in order to bring action for refund when it had no reason to anticipate that Department would engage in discriminatory conduct in the future); A.R.S. § 42–124(B)(2), added by Laws 1985, ch. 366, § 13 (eff. July 1, 1986).

a general contractor.[6] Double taxation is not favored, and an intent to impose it should not be presumed. *Industrial Comm'n v. Hartford Accident & Indem. Co.,* 61 Ariz. 86, 144 P.2d 548 (1943). In our opinion, the lack of any statutory authority dealing with this most basic problem, again unlike the Tucson City Code which allows tax credits, is indicative of the legislature's intent not to impose liability upon an owner for the contracting tax already assessed against the general contractor. *See Martin v. Martin,* 156 Ariz. 452, 457, 752 P.2d 1038, 1043 (1988) (primary task in interpreting a statute is to determine and carry out the intent of the legislature); *Ebasco Servs., Inc. v. Arizona State Tax Comm'n,* 105 Ariz. 94, 97, 459 P.2d 719, 722 (1969) (taxing statutes are to be strictly construed against the taxing authority and liberally construed in favor of the taxpayer).

■ In sum, because these taxpayers are not "contractors" within the meaning of A.R.S. § 42–1301(3), they are not taxable under § 42–1310(2)(j) as "owner-builders." In our opinion, the tax assessed against owner-builders who sell within 24 months of construction is reserved to only those "owner-builders" who do not contract with a general contractor but who act as such themselves, thereby potentially escaping liability for payment of the tax. While the builders dealt with in *Moore v. Smotkin* might now be taxed, these taxpayers do not fall into this category.

### ATTORNEYS' FEES

Finally, the Department contends that the trial court abused its discretion in awarding the taxpayers attorneys' fees in excess of $75 per hour. We disagree.

A party who prevails on the merits against the state in an action challenging the assessment or collection of taxes is entitled to an award of attorneys' fees.

A.R.S. § 12–348(A)(2). The amount of fees recoverable under this subsection is dictated, in part, by § 12–348(D)(2), which provides:

(D) The court shall base any award of fees as provided in this section on prevailing market rates for the kind and quality of the services furnished, except that:

. . . .

(2) The award of attorney fees may not exceed ... a maximum amount of seventy-five dollars per hour *unless* the court determines that an increase in the cost of living *or* a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee.

(Emphasis added.)

■ The trial court specifically awarded the taxpayers their attorneys' fees "based on the cost of living increase above the $75.00 per hour statutory fee." In so doing, the court further determined that several special factors also justified assessment of fees in excess of $75.00 per hour. On appeal, the Department first attacks the validity of these special factors, citing *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), and then contends that, absent a special factor, there can be no adjustment of the statutory rate for cost of living or otherwise.

Unfortunately, this argument simply flies in the face of the plain language of subsection (D)(2), which provides that fees may not exceed the statutory rate "unless the court determines that an increase in the cost of living *or* a special factor ... justifies a higher fee." In this case, the trial court specifically determined that a cost of living adjustment to the hourly rate of $75.00 was justified. Subsection (D)(2) requires nothing more. We find no abuse of discretion.[7]

6. We assume that, in practice, the general contractor determines its potential tax liability and passes this on to the owner as part of the contract amount. In order to properly allocate between them any potential tax liability, the owner would have to foresee at the time of contracting with the general contractor that he intends subsequently to sell the property.

7. We note that the taxpayers' counsel also represented these same taxpayers in *City of Phoenix, supra.* However, we need not decide if this is

CONCLUSION

We hold that an owner who contracts with a general contractor for the construction of improvements does not thereby become a "contractor" for transaction privilege taxing purposes. Therefore, these taxpayers were not properly taxed as "contractors" or as "owner-builders" upon the proceeds from the 16 sales in question.[8] Summary judgment in favor of the taxpayers is affirmed. The taxpayers' request for attorneys' fees pursuant to A.R.S. § 12–348 is granted, upon compliance with Rule 21, Arizona Rules of Civil Appellate Procedure.

LANKFORD, J., and LEVI RAY HAIRE, Retired Judge, concur.

NOTE: The Honorable LEVI RAY HAIRE was authorized to participate in this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.

---

an appropriate "special factor" under § 12–348(D)(2).

**8.** Because we find that the taxpayers did not operate as "contractors" or "owner-builders," we need not decide whether they were engaged in the "business" of doing so. *See* former A.R.S. § 42–1301(1).