11 P.3d 1054

US WEST COMMUNICATIONS,
INC., a Colorado corporation,
Plaintiff/Appellee,

v.

CITY OF TUCSON, a municipal cor-
poration, Defendant/Appellant.

No. 1 CA–TX 99–0021.

Court of Appeals of Arizona,
Division 1, Department T.

Oct. 24, 2000.

**518**

Fennemore Craig by Paul J. Mooney, Kendis K. Muscheid, Phoenix, for Plaintiff/Appellee.

Ulrich & Anger, P.C. by Paul G. Ulrich, Phoenix, and Gabroy, Rollman & Bossé, PC by Lyle D. Aldridge, Tucson, for Defendant/Appellant.

## OPINION

NOYES, Judge.

¶ 1 The City of Tucson ("the City") appeals from a tax court judgment that invalidated the 1.5% tax imposed by Tucson City Code section 19–1070(a)(2)(i) (effective Jan. 1, 1998), on the gross income of persons who provide telecommunication services to consumers in Tucson and use any City rights-of-way in doing so ("the 1.5% tax"). The tax court ruled that the 1.5% tax was invalid as a prohibited "tax, rent, fee or charge [on] a telecommunications corporation *for the use of a public highway to provide telecommunications services."* Ariz.Rev.Stat. Ann. ("A.R.S.") § 9–582(A) (Supp.1999) (emphasis added). The court held further that the 1.5% tax did not constitute a "transaction privilege tax authorized by law on the business of providing telecommunications services" exempt from the general prohibition as provided in A.R.S. section 9–582(A)(1). The appeal presents these questions:

1. Whether the tax court erred in determining that the 1.5% tax was not a "transaction privilege tax" within the exception provided in A.R.S. section 9–582(A)(1);

2. Assuming the 1.5% tax constituted a "transaction privilege tax" within A.R.S. section 9–582(A)(1),

   a. whether it was nevertheless invalid as a double tax;

   b. whether the 1.5% tax was invalid because it was beyond the authority conferred by the City's Charter; and

   c. whether imposition of the 1.5% tax violated taxpayer US West Communica-

tions, Inc.'s right to equal protection of the laws.

This court has appellate jurisdiction under A.R.S. section 12–2101(B) (1994). We answer the first question in the affirmative and the rest in the negative. We therefore reverse with directions to enter judgment for the City.

## *FACTS AND PROCEDURE BELOW*

¶ 2 US West Communications, Inc. ("US West") and its predecessors in interest have provided telecommunications services in the City of Tucson and throughout the State of Arizona since before statehood under legislative franchise. Other providers of telecommunications services in the City of Tucson must enter into franchise agreements with the City and pay agreed fees for the exercise of their franchise rights.

¶ 3 Since 1962, the City's Charter has authorized a transaction privilege tax calculated as a percentage of the "gross income, or gross value, or gross proceeds of sale, as the case may be, of the business done by the taxpayer." Tucson Charter ch. IV, § 2. The authorized rate was 1% initially, and then increased to 2% in 1969. *Id.* at editor's note (discussing Ord. No. 3346, § 1 (effective Dec. 29, 1969)). One of the categories of business activities on which the City has imposed this tax is that of "providing telecommunication services to consumers" in the City. Tucson Code § 19–470 (1996). "Telecommunication services" under this classification include "[t]wo-way voice, sound, and/or video communication over a communications channel." Tucson Code § 19–470(a)(1)(a).

¶ 4 Since 1967, the City's Charter has also authorized a tax on the "gross income or gross value or gross proceeds of sales or the provision of services … by public utilities whether or not such public utilities are doing business under a franchise." Tucson Charter ch. XVII, § 16 (effective Oct. 14, 1967). This provision expressly authorizes public utility taxes in excess of the percentage tax rate limit applicable to the transaction privilege tax under Chapter IV, Section 2, of the City's Charter.

¶ 5 As Chapter XVII, Section 16, authorizes, the City imposes a tax "upon persons on account of their public utility business activities." Tucson Code § 19–1000(a) (1988). The tax is "in addition to all other licenses, fees and taxes levied by law." Tucson Code § 19–1000(b). The tax rate is 2% of public utilities' gross income from, *inter alia,* "providing telecommunication services." [1] Tucson Code § 19–1070(a)(1).

¶ 6 In December 1997, the City added a second tier to the tax rate for the "telecommunication services" classification under the public utility tax. Tucson Code section 19–1070(a)(2)(i) imposes an additional 1.5% tax "upon the gross income of providing telecommunication services by any provider who uses any city rights-of-way." Section 19–1070(a)(2)(ii) excludes from the scope of the additional tax the gross telecommunication services income of (1) resellers of solely interstate services, (2) resellers who do not separately bill customers for local exchange service, and (3) telecommunication services providers who principally use wireless transmitter/receiver cell sites with no more than 1000 feet of facility installation per cell site within City rights-of-way. Additionally, section 19–1070(a)(2)(iii) provides:

> All franchise or license payments made by a person to the city shall be credited toward the payment of the public utility tax levied in this article III. All right-of-way permit payments made by a person to the city shall be credited towards the payment of the public utility tax levied in this subsection (a)(2)(i).

¶ 7 In 1998, the Arizona Legislature enacted A.R.S. sections 9–581 to –583 (Supp.1999) and made them retroactively effective to November 1, 1997. 1998 Ariz. Sess. Laws, ch. 220, § 2. Section 9–582 provides in relevant part:

> A. A political subdivision shall not levy a tax, rent, fee or charge to a telecommunications corporation for the use of a public highway [2] to provide telecommunications services, or levy a tax, fee or charge upon the privilege of engaging in the business of providing telecommunications services within that political subdivision other than:
>
> 1. Any transaction privilege tax authorized by law on the business of providing telecommunications services. Any transaction privilege tax authorized by law on the business of providing commercial mobile radio service shall not exceed the tax rate levied on a telecommunications corporation.
>
> 2. A public highway construction permit fee if the permit fee applies to all telecommunications corporations using the political subdivision's public highways to provide telecommunications services.

¶ 8 In November 1998, US West brought this action against the City seeking to enjoin and declare unlawful the imposition of the 1.5% tax under Tucson Code section 19–1070(a)(2). On cross-motions for summary judgment, the tax court held that the 1.5% tax violated A.R.S. section 9–582(A) because it was a "tax, rent, fee or charge to a telecommunications corporation for the use of a public highway." The court held further that the 1.5% tax was not a "transaction privilege tax" of the kind permitted by section 9–582(A)(1) because

---

1. Tucson Code section 19–700 (1997) provides these definitions applicable to the public utility tax:

   *Public utility* means a person carrying on an enterprise for the accommodation of the public, the members of which, as such, are entitled as of right to use its facilities, without discrimination. *Public utility business activity* includes only those activities of a public utility which comprise the enterprise carried on for the accommodation of the public, and to which the members of the public are entitled as a matter of right and without discrimination. "Public utility business activity" does not include those activities of a public utility which also may be carried on in

competition with the public utility by persons who are not public utilities.

   . . . .

   *Telecommunication service* means any service or activity connected with the transmission or relay of sound, visual image, data, information, images or material over a communications channel or any combination of communications channels, to the extent such service or activity comprises public utility business activity.

2. For the purposes of A.R.S. sections 9–581 to –583, "public highway" and "highway" include any "dedicated public rights-of-way and public utility easements of this state or a political subdivision." A.R.S. § 9–581.

[u]nder [the City's] scheme, whether a taxpayer pays 2% or 3.5% is entirely dependent upon whether the taxpayer uses [the City's] rights-of-way. Therefore, the tax at issue is clearly not on the privilege of providing telecommunications services, but is instead, a tax on using [the City's] rights-of-way. Therefore, it is not a transaction privilege tax.

The tax court entered judgment for US West and an award of costs and $20,000 in attorneys' fees under A.R.S. section 12–348 (Supp. 1999). After moving unsuccessfully for a new trial, the City commenced this timely appeal.

### ANALYSIS

### Code Section 19–1070(a)(2)(i) and A.R.S. Section 9–582(A)

¶ 9 The City contends that the tax court interpreted A.R.S. section 9–582(A) incorrectly. It urges that both the statute's language and its historical background and development require us to conclude that A.R.S. section 9–582(A)(1) permits political subdivisions to levy transaction privilege taxes applicable only to telecommunication companies that occupy or otherwise use public rights-of-way.

¶ 10 US West supports the tax court's ruling on a number of grounds. It argues first that Tucson Code section 19–1070(a)(2) runs afoul of A.R.S. section 9–582(A) because it levies a "tax ... to a telecommunications corporation for the use of a public highway to provide telecommunications services." US West maintains that the statute provides no exceptions to this prohibition. Relying on the "doctrine of last antecedent" as discussed in *Federal Mutual Liability Insurance Co. v. Industrial Commission*, 32 Ariz. 293, 297–98, 257 P. 982, 984 (1927), US West contends that the exceptions in subsections (1) and (2) of A.R.S. section 9–582(A) apply only to the second clause of section 9–582(A), prohibiting taxes, fees, and charges on the business of providing telecommunications services, and not to the first clause, prohibiting taxes "for the use of a public highway to provide telecommunications services." US West accordingly concludes that A.R.S. section 9–582(A)(1) allows no tax at all, even a transac-

tion privilege tax, relating to the use of a right-of-way.

¶ 11 We interpret or construe statutes for the sole purpose of identifying and effectuating the underlying legislative intent. *Mail Boxes, Etc., U.S.A. v. Indus. Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995); *Devenir Assocs. v. City of Phoenix*, 169 Ariz. 500, 503, 821 P.2d 161, 164 (1991). In doing so, we look first to the statute's words, and if the words fail to disclose legislative intent, we read the statute as a whole and give meaningful effect to all its provisions. *Mail Boxes*, 181 Ariz. at 121, 888 P.2d at 779; *Devenir*, 169 Ariz. at 503, 821 P.2d at 164.

¶ 12 A statute is to be read and applied in accordance with any special statutory definitions of the terms that it uses. *Tobel v. State*, 189 Ariz. 168, 174, 939 P.2d 801, 807 (App.1997). If a statute's meaning is manifestly unambiguous when all its language is considered as a whole, that meaning is conclusive. *Mail Boxes*, 181 Ariz. at 121, 888 P.2d at 779. When statutory language is clear, unequivocal, and unambiguous, this court must give effect to the language and may not invoke the rules of statutory construction to interpret it. *E.g., Paging Network of Ariz., Inc. v. Ariz. Dep't of Revenue*, 193 Ariz. 96, 97, ¶ 8, 970 P.2d 450, 451 (App. 1998).

¶ 13 We cannot agree with US West that the "transaction privilege tax" exception contained in A.R.S. section 9–582(A)(1) must be interpreted to apply only to the second clause of subsection A, generally prohibiting municipal taxes, fees, and charges on the business of providing telecommunications services. US West's rationale for that contention would necessarily encompass the exceptions in both subsections (A)(1) and (A)(2). Accordingly, US West's analysis necessarily fails unless the content of both exceptions relates exclusively to the substance of the second clause of subsection (A). But that is not the case.

¶ 14 Subsection (A)(2) allows a political subdivision to charge a public highway construction permit fee if the fee applies to everyone who uses the public highways to provide telecommunications services. Sub-

section (A)(2) thus plainly operates as an exception to the prohibition in the first clause of subsection (A) against "levy[ing] a tax, rent, fee or charge to a telecommunications corporation *for the use of a public highway* to provide telecommunications services."[3] (Emphasis added.) This conclusion is fatal to US West's bid to insulate the first clause of subsection (A) from the exceptions in subsections (A)(1) and (A)(2) under the "doctrine of last antecedent."

¶15 Moreover, the "transaction privilege tax" exception in subsection (A)(1) likewise logically applies to the first clause of subsection (A) because both the clause and the subsection focus on governmental exactions on the business of "provid[ing] telecommunications services." We find no merit to US West's contention that the first clause of subsection (A) was intended as categorical and absolute, wholly unaffected by the exceptions provided by subsections (A)(1) and (A)(2). *Cf. Phoenix Control Sys. v. Ins. Co. of N. Am.*, 165 Ariz. 31, 34, 796 P.2d 463, 466 (1990) ("The last antecedent rule is not inflexible and it will not be applied where the context or clear meaning of a word or phrase requires otherwise.").

■ ¶16 US West contends in the alternative that the tax court correctly held that the 1.5% tax imposed by Tucson Code section 19–1070(a)(2) does not qualify as a "transaction privilege tax ... on the business of providing telecommunications services" within the exception provided by A.R.S. section 9–582(A)(1). US West reasons that this is so because the event that triggers application of the 1.5% tax is the taxpayer's use of public rights-of-way and not its engaging in a particular taxable business within the City. US West's contention is in error, as is the tax court's ruling in accordance with it.

¶17 Their reasoning fails to take account of and give meaning to all applicable statutory provisions. The tax court's determination that the 1.5% tax imposed by Tucson Code section 19–1070(a)(2) was not a "transaction privilege tax" of the kind permitted by section 9–582(A)(1) might appear plausible if the term "telecommunications services" as used in that statute carried its ordinary meaning. Let us assume, for example, that "telecommunications services" within A.R.S. section 9–582 included all transmission or relaying of sound, visual images, data, information, or material over any communications channel. *See* Tucson Code § 19–700. In that situation a political subdivision's decision to tax only revenues from such "telecommunications services" as were accomplished using public rights-of-way might reasonably appear to be focused deliberately on extracting compensation for such use and therefore arguably not qualify as a transaction privilege tax on the business of providing "telecommunications services" within A.R.S. section 9–582(A)(1).

¶18 Our illustrative assumption, however, is not true to the governing statutes. Arizona Revised Statutes Annotated section 9–581(6) defines "telecommunications services" as "the offering of telecommunications for a fee directly to the public, or to such users as to be effectively available directly to the public, regardless of the facilities used." Section 9–581(4) provides:

"Telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received. *The term does not include commercial mobile radio services, pay phone services, interstate services or cable services.*

(Emphasis added.) The first sentence of this definition effectively states the commonly understood meaning of "telecommunications."[4] The second sentence, however, drastically

---

**3.** Arguably, but less likely, subsection (A)(2), which allows for public highway construction permit fees, may also have been meant to function as an exception to the prohibition in the second clause of subsection (A) against "levy[ing] a tax, fee or charge upon ... the business of providing telecommunications services within th[e] political subdivision."

**4.** Merriam–Webster's Collegiate Dictionary 1211 (10th ed.1999) defines "telecommunication" as "communication at a distance (as by telephone)." Webster's Seventh New Collegiate Dictionary 906 (7th ed.1971) defines "telecommunication" as "communication at a distance (as by cable, radio, telegraph, telephone, or television)."

constricts the meaning of that term as used in A.R.S. sections 9–581 to –583.

¶ 19 The significance of this restricted statutory definition becomes apparent when the exception in A.R.S. section 9–582(A)(1) is restated in light of it. Taking due account of A.R.S. section 9–581(4) and (6), section 9–582(A)(1) expressly permits political subdivisions to impose transaction privilege taxes *on the business of transmitting (by means other than commercial mobile radio, pay telephone, or cable facilities) information of the user's choosing between or among points in Arizona specified by the user without change in form or content.* Thus understood, subsection (A)(1) effectively empowers political subdivisions to impose transaction privilege taxes on the business of providing traditional local telephone service via above- or below-ground facilities installed on public rights-of-way. It is this specific, limited grant of authority that we must use to test the validity of the City's 1.5% tax under Tucson Code section 19–1070(a)(2).

¶ 20 The City imposes its public utility tax on "persons on account of their public utility business activities . . . to be measured by the[ir] gross income." Tucson Code § 19–1000(a). One of the public utility business activities on which the tax is imposed is that of "telecommunication service," broadly defined as "any service or activity connected with the transmission or relay of sound, visual image, data, information, images or material over a communications channel." Tucson Code § 19–700. Subsection (a)(1) of Code section 19–1070 imposes a tax "on the business of providing telecommunication services [5] to consumers within this city" at the rate of 2% of the gross income from that business, excluding income from reselling solely interstate services. This tax applies to virtually all providers of telecommunications services as that term is ordinarily understood, including providers of commercial mo-

bile radio (cellular telephone) services, pay telephone services, and cable-based telecommunications services.

¶ 21 Subsection (a)(2) of Tucson Code section 19–1070 increases the tax rate for the telecommunication services public utility tax to a total of 3.5% for gross income earned by any telecommunication services provider "who uses any city rights-of-way." This in effect creates a separate, additional transaction privilege tax on the business of providing "telecommunications services" *as that term is defined in A.R.S. section 9–581(4) and (6) and applied in A.R.S. section 9–582(A)(1).* As we have held, those statutes expressly authorize political subdivisions to impose transaction privilege taxes on the business of transmitting information *by means other than commercial mobile radio, pay telephone, or cable facilities*—in other words, through the use of public utility easements and rights-of-way. Tucson Code section 19–1070(a)(2) taxes that very business.

¶ 22 US West observes, however, that the additional 1.5% tax imposed by Tucson Code section 19–1070(a)(2) "is levied *only* when a provider rendering telecommunications services **'uses any city rights-of-way.'**" US West argues:

> Only those telecommunications service providers who use the rights-of-way pay the tax. As such, the incidence of the tax really derives from the use of City rights-of-way, *not* from the business activity conducted therein. Such is not a transaction privilege tax.

¶ 23 This analysis is defective. No measure of the taxpayer's actual use of the City's rights-of-way enters into calculating the amount of tax owed under Tucson Code section 19–1070(a)(2). Section 19–1070(a)(2) does not restrict the base for the 1.5% tax to income from any particular portion of the

---

5. Tucson Code section 19–700 defines "[p]roviding telecommunication services" as

> providing transmissions between or among points specified by the user, of information of the user's choosing (whether voice, video, or data), without change in content of the information as sent and received, where such transmissions are accomplished through a telecommunication network. Telecommunications

> services shall include all ancillary or adjunct switching services and signal conversions rendered as a function of underlying transmission services, but excludes interstate long distance transmissions. Telecommunications services also include all content or value-added services rendered in conjunction with transmission services.

affected taxpayer's business or to income derived directly from using City rights-of-way. Like the 2% tax under subsection (a)(1) of Code section 19–1070, the 1.5% tax is calculated on the affected taxpayer's entire gross income from providing telecommunications services to Tucson consumers. The 1.5% tax does not fall on the use of City rights-of-way alone. It constitutes a genuine transaction privilege tax levied on the business of providing telecommunications services, as that term is ordinarily understood, using City rights-of-way. As we have held, this tax was within the City's authority under A.R.S. section 9–582(A)(1).

¶ 24 US West further contends that the 1.5% tax does not qualify as a true "transaction privilege tax" within A.R.S. section 9–582(A)(1), and therefore was beyond the City's power to adopt in any event. We disagree. In Arizona a "transaction privilege tax" is an excise on the privilege or right to engage in particular businesses within the taxing jurisdiction. *Tower Plaza Invs. Ltd. v. DeWitt*, 109 Ariz. 248, 250, 508 P.2d 324, 326 (1973); *Indus. Uranium Co. v. State Tax Comm'n*, 95 Ariz. 130, 132, 387 P.2d 1013, 1014 (1963). The City's public utility tax is imposed on "persons on account of their public utility business activities." Tucson Code § 19–1000(a). Although section 19–1000(a) does not expressly identify the tax as one on the "privilege" or "right" to engage in such activities, it is plain from the context and content of the public utility taxing ordinances that that is its basic nature.

¶ 25 US West nevertheless argues at some length that the City's separate Charter authorizations for its business privilege and public utility taxes belie the view that the public utility taxes imposed under Tucson Code section 19–1070(a) qualify as "transaction privilege taxes." We disagree. Tucson Charter Chapter XVII, Section 16, which authorizes the public utility tax, expressly excepts it from the percentage rate cap by which Chapter IV, Section 2, of the Charter limits the business privilege tax. There would have been no need for that exception if the public utility tax had not been understood as authorizing new and additional transaction privilege taxes on public utility business activities that would otherwise have fallen within the Charter's Chapter IV, Section 2, percentage rate cap. Unlike US West, we find nothing "disingenuous" about the City's position that its business privilege and public utility taxes are both "transaction privilege taxes."

¶ 26 US West additionally observes that Tucson Code section 19–1070(a)(2)(iii) provides a credit against the taxes imposed by Tucson Code section 19–1070(a)(1) and (2) for franchise fees that utilities pay the City for the use of its rights-of-way. US West argues that the 1.5% tax itself is therefore nothing more than a surrogate charge for using the rights-of-way and is invalid under the first clause of A.R.S. section 9–582(A). We disagree.

¶ 27 First, as US West recognizes, the franchise fee credit is not restricted to the 1.5% tax under Code section 19–1070(a)(2). It applies as well to the 2% tax imposed by subsection (a)(1) on all providers of telecommunications services regardless of their use of public rights-of-way.

¶ 28 Moreover, and more importantly, our interpretation of A.R.S. section 9–582(A) vitiates the premise underlying US West's analysis on this point. It is true that the first clause of section 9–582(A) prohibits municipal taxes "for the use of a public highway." Section 9–582(A)(1), however, provides an exception from that general prohibition for "[a]ny transaction privilege tax ... on the business of providing telecommunications services." By its nature, an exception overrides in its entirety the general rule to which it applies. The exception in A.R.S. section 9–582(A)(1) accordingly operates regardless of whether the "transaction privilege tax" in question might be viewed as imposed in whole or in part "for the use of a public highway." As we have held, the 1.5% tax under Tucson Code section 19–1070(a)(2) qualifies as a "transaction privilege tax" within A.R.S. section 9–582(A)(1).

¶ 29 US West argues that the affidavit offered by the City from attorney Joseph Van Eaton pertaining to the negotiations that are said to have led to the adoption of section 9–582 is "improper and inadmissi-

ble." The City counters that Van Eaton "participated in the negotiation and drafting of this statute" and thus can provide uncontradicted statements of fact regarding the legislative intent underlying section 9–582. Citing *Hayes v. Continental Insurance Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994), the City contends that "[i]f the Court believes the statute's text allows for more than one rational interpretation, resort to secondary resources is appropriate." However, we agree with US West that the affidavit consists of advocacy and personal opinion. We find no exception making it admissible and instead adhere to the general rule that "[t]he same logic which prevents one legislator from putting a gloss upon the meaning of a statute based only upon his own individual feelings also prevents a lobbyist or other interested party from doing the same." *Golder v. Dep't of Revenue*, 123 Ariz. 260, 265, 599 P.2d 216, 221 (1979). Moreover, because we interpret A.R.S. section 9–582(A) based on its language and context alone, we need not consider the affidavit.

¶ 30 We likewise do not address US West's contention that the City's repeal of a "right-of-way rental fee" ordinance in settlement of earlier litigation constitutes an admission that undermines the City's claim in this case. The meaning of A.R.S. sections 9–581 and –582 is apparent from a thorough reading of the statutes alone. The tax imposed by Tucson Code section 19–1070(a)(2) is valid under A.R.S. section 9–582(A)(1).

**Double Taxation**

■ ¶ 31 US West contends that even if the 1.5% tax under Code section 19–1070(a)(2) passes muster under A.R.S. section 9–582, the tax is an invalid "double tax." Again we disagree.

■ ¶ 32 We grant that double taxation is presumed not to be within the intent of a legislative body. *Indus. Comm'n v. Hartford Accident & Indem. Co.*, 61 Ariz. 86, 90, 144

P.2d 548, 550 (1943); *SDC Mgmt., Inc. v. Dep't of Revenue,* 167 Ariz. 491, 500, 808 P.2d 1243, 1252 (App.1991). We also acknowledge that A.R.S. section 42–11003 (1999), formerly section 42–202, directs the courts not to construe statutes in A.R.S. Title 42 [6] "to require or permit double taxation." Contrary to US West's analysis, however, neither the cases nor the statute constitutes authority for its underlying thesis that "double taxation" is otherwise fundamentally "impermissible."

■ ¶ 33 Moreover, "[d]ouble taxation occurs [only] 'when the same property or person is taxed twice for the same purpose for the same taxing period by the same taxing authority.'" *Miami Copper Co. v. State Tax Comm'n,* 121 Ariz. 150, 154, 589 P.2d 24, 28 (App.1978) (quoting *Milwaukee Motor Transp. Co. v. Comm'r of Tax.,* 292 Minn. 66, 193 N.W.2d 605, 612 (1971)). The proposition that Tucson Code subsections 19–1070(a)(1) and (2) impose double taxation is at best doubtful.

¶ 34 As we have suggested previously, these two subsections in effect define two subclassifications of the telecommunication services public utility tax. Subsection (a)(2) defines a subclassification of public utilities that provide telecommunication services, as defined in Code section 19–700, using public rights-of-way. The tax on that subclassification is 3.5% of gross income from the business. The subclassification defined by subsection (a)(1) comprehends all other telecommunication services utilities.[7] The tax on that subclassification is 2% of gross income from the business. US West falls into the former subclassification and is taxed under it, once, at 3.5%.

■ ¶ 35 The "rule" against "double taxation" is a principle of statutory interpretation. As such, it may be overcome by clear, express statutory language. Here, regardless of whether Tucson Code subsections 19–1070(a)(1) and (2) impose a species of "double

---

6. The tax provided by Tucson Code section 19–1070(a)(2) is imposed by dint of the Tucson City Charter, not A.R.S. Title 42. *E.g., Buntman v. City of Phoenix,* 32 Ariz. 18, 25–26, 255 P. 490, 492–93 (1927); *McCarthy v. City of Tucson,* 26 Ariz. 311, 313–15, 225 P. 329, 330–31 (1924).

7. This subclassification also includes those telecommunication services utilities whose minimal use of public rights-of-way, as particularized by subsection (a)(2)(ii)(3), excludes them from the (a)(2) subclassification.

taxation," the language of those provisions makes it unmistakably clear that the City intended that US West and any others who might provide telecommunication services to Tucson consumers using public rights-of-way would pay a full 3.5% public utility tax under the telecommunication services classification. Because that is so, the question of "double taxation" is of no further significance in this litigation.

### City Charter Authorization for Tax in Code Section 19–1070(a)(2)

¶ 36 US West further contends that the tax court's judgment must be sustained because the City's Charter does not authorize the 1.5% tax imposed in Tucson Code section 19–1070(a)(2). US West reasons that even after the City's Charter, Chapter XVII, Section 16, authorized the public utility tax, the 2% rate cap imposed by Chapter IV, Section 2, of the Charter continued to apply to all municipal "transaction privilege taxes." US West argues that if the 1.5% tax under Code section 19–1070(a)(2) is a transaction privilege tax as the City contends, then it violates the 2% rate cap and is invalid.

¶ 37 US West is mistaken. Charter Chapter XVII, Section 16, expressly permits the City to impose public utility taxes at rates with no specified upper limit "[n]otwithstanding any other provisions of the Charter of the City of Tucson, and notwithstanding the limitation of the transaction privilege tax to one (1) percent [8] in Chapter IV, section 2." As we have pointed out, there would have been no need for those prefatory provisions if the public utility tax had not been understood as authorizing new and additional "transaction privilege taxes" on public utility business activities. The City's Charter, Chapter XVII, Section 16, authorizes the tax imposed by Tucson Code section 19–1070(a)(2).

### Equal Protection

¶ 38 US West finally contends that the judgment must be affirmed on the theory that the 1.5% tax imposed by Tucson Code section 19–1070(a)(2) violates US West's rights under the Equal Protection Clause of the United States Constitution. See U.S. Const. amend. XIV, § 1. US West points out that the 1.5% tax applies only to telecommunication services providers like US West who use public rights-of-way, and applies to no other right-of-way users, including cable companies who provide telecommunications services over their own cable systems. US West notes in addition that it and other like telecommunication services providers receive no offsets against the public utility tax under Tucson Code section 19–1070(a)(2)(iii) for "franchise" payments. US West argues that these legislative inequalities in treatment lack any rational basis. We cannot agree.

¶ 39 US West's claim of unreasonable inequality of treatment due to denial of credits for franchise payments is defective on its face. Only those who owe fees under franchise agreements have to pay them. US West is exempt from such agreements, owes no such fees, and accordingly does not pay them. See A.R.S. § 9–583(D). The City's decision in its public utility taxing scheme not to make franchise fee credits available to those who pay no such fees stands on constitutionally firm ground.

¶ 40 We are likewise unconvinced by US West's contention that the City violates equal protection principles by imposing the 1.5% tax only on US West and other like providers of traditional local telephone service via above- or below-ground facilities installed on public rights-of-way. An equal protection challenge to a legislative tax classification can succeed only if the taxpayer can demonstrate that the classification is not rationally related to any conceivable legitimate governmental purpose. E.g., Martin v. Reinstein, 195 Ariz. 293, 309–10, ¶ 52, 987 P.2d 779, 795–96 (App.1999); Brink Elec. Constr. Co. v. Ariz. Dep't of Revenue, 184 Ariz. 354, 362, 909 P.2d 421, 429 (App.1995). A legislative classification "may be based on rational speculation unsupported by evidence or empirical data," FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct.

---

8. As we noted previously, the initial maximum authorized rate of 1% was increased to 2% in

1969. Tucson Charter ch. IV, § 2, editor's note.

2096, 124 L.Ed.2d 211 (1993), and will survive rational basis review unless the court is convinced beyond a reasonable doubt that the legislative classification is wholly unrelated to any legitimate legislative goal. The burden is on the challenging party to demonstrate that there is no conceivable basis for the disparity in treatment. *See Martin,* 195 Ariz. at 309–10, ¶ 52, 987 P.2d at 795–96.

¶ 41 US West fails to make this showing here. It argues:

> Users to which the [1.5% tax] does **not** apply include public utilities, cable television providers, electricity, natural gas, water, and sewer systems, and motor vehicles. Even though these other classifications of users impose an equal or greater burden on City rights-of-way, and thereby avail themselves of precisely the same privileges granted by the City, only providers of telecommunications services are subject to the [1.5% tax].

US West does not attempt to characterize the nature of the "burden" on public rights-of-way to which it refers. "Burdens" may affect many human and governmental interests, including those based on convenience, finances, health, safety, and aesthetics. In any event, US West fails to point to anything in the record that supports its claim that other users impose any variety of "burden" on public rights-of-way that equals or exceeds those imposed by right-of-way users subject to the 1.5% tax.

¶ 42 Based on everyday experience and the shared popular history of our culture in this century, ordinary citizens and their representatives may well believe that the physical infrastructures that underpin the business of providing traditional local telephone services are more obtrusive, extensive, or unsightly than those of other businesses and activities that use public rights-of-way in urban areas. In enacting A.R.S. section 9–582 and Tucson Code section 19–1070(a)(2), respectively, the Arizona Legislature and the Tucson City Council could rationally have concluded that providers of traditional local telephone services would tend to use public rights-of-way more frequently, intensely, and disruptively than any other right-of-way users, including

cable companies that provide telecommunications services over their own cable systems.

¶ 43 The rational basis test requires no more than this. Our supreme court has stated:

> [In imposing excise taxes] the legislature may select certain classes of privileges, businesses, or occupations and leave others untaxed. As is said by Cooley in his work on Taxation, fourth edition, volume IV, section 1685:
>
> "All occupations need not be taxed. One or more may be taxed and others not taxed. The sovereignty may, in the discretion of its legislature, levy a tax on every species of property within its jurisdiction, or, on the other hand, it may select any particular species of property, and tax that only, if in the opinion of the legislature that course will be wiser. And what is true of property is true of privileges and occupations also; the state may tax all, or it may select for taxation certain classes and leave the others untaxed."

*Stults Eagle Drug Co. v. Luke,* 48 Ariz. 467, 476, 62 P.2d 1126, 1130 (1936).

¶ 44 Citing *Gila Meat Co. v. State,* 35 Ariz. 194, 198–202, 276 P. 1, 2–4 (1929), US West also argues that the 1.5% tax under Tucson Code section 19–1070(a)(2) improperly taxes on the basis of where business activity is undertaken, in violation of the Privileges and Immunities Clause of the Arizona Constitution. *See* Ariz. Const. art. 2, § 13. Again it is wrong. The tax invalidated in *Gila Meat* was a license tax on slaughterhouses in fixed amounts that varied according to the size of the town in or near which the slaughterhouse operated. 35 Ariz. at 195–96, 276 P. at 1–2. Slaughterhouses in or close to the largest towns were charged $150 annually. *Id.* at 195–96, 276 P. at 1. The annual charges for those in or near smaller towns were $120 and $90 depending on population, and charges for those over four miles from any town were $30. *Id.* at 196, 276 P. at 1–2. The court invalidated the taxing statute on the ground that it imposed different taxes on persons engaged in the same business without any basis in a "reasonable classification for purposes of the public health, safety or general welfare," and also

effectively granted to certain persons "privileges and immunities ... not granted to others similarly situated on equal terms." *Id.* at 202, 276 P. at 3–4.

¶ 45 *Gila Meat* is entirely distinguishable from this case. Unlike the slaughterhouse license tax invalidated in that case, Tucson Code section 19–1070(a)(2) does not tax on the basis of where the pertinent business activity is conducted. The 1.5% tax is calculated on the affected taxpayer's entire gross income from providing traditional local telecommunications services to City consumers. The tax base is not restricted to income derived directly from using City rights-of-way. The tax applies according to the nature of the business. *Gila Meat* does not sustain the judgment for US West.

### CONCLUSION

¶ 46 The 1.5% tax imposed by Tucson Code section 19–1070(a)(2) is within the exception of A.R.S. section 9–582(A)(1) to the general prohibition against municipal taxes "for the use of a public highway," enunciated in the first clause of section 9–582(A). The 1.5% tax is not an "impermissible double tax" and exists within the authority conferred by the City's Charter. The tax does not violate US West's rights under the Equal Protection Clause of the United States Constitution, Amendment XIV, Section 1, or the Privileges and Immunities Clause of the Arizona Constitution, Article 2, Section 13.

¶ 47 The judgment and separate order awarding costs and attorneys' fees to US West are reversed, and the matter is remanded with directions to enter judgment for the City.

CONCURRING: JAMES B. SULT, Presiding Judge, and CECIL B. PATTERSON, Jr., Judge.

