4 P.3d 1050

**CABLE PLUS COMPANY, L.P., a Washington limited partnership, Plaintiff–Appellee,**

v.

**ARIZONA DEPARTMENT OF REVENUE, Defendant– Appellant.**

No. 1 CA–TX 99–0009.

Court of Appeals of Arizona, Division 1, Department T.

April 20, 2000.

508

Snell & Wilmer, L.L.P. by Janet E. Barton, Phoenix, for Plaintiff–Appellee.

Janet Napolitano, Attorney General by Sara D. Branscum, Assistant Attorney General, Phoenix, for Defendant–Appellant.

## OPINION

TOCI, Judge.

¶ 1 The Arizona Department of Revenue ("ADOR") appeals from a summary judgment for taxpayer Cable Plus Company, L.P. ("Cable Plus") on Cable Plus's challenge to delinquent telecommunications transaction privilege taxes assessed pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 42–5064 (1999). Section 42–5064(C) defines intrastate telecommunications services as "transmitting signs, signals, writings, images, sounds, messages, data or other information of any nature by wire, radio waves, light waves or other electromagnetic means if the information transmitted originates and terminates in this state."

¶ 2 The dispositive issue is whether Cable Plus transmits information that "originates and terminates in this state" when it electronically processes raw satellite programming from out of state so that the informa-

tion can be received on a standard television set. We agree with the tax court that the information transmitted by Cable Plus does not originate in this state and that Cable Plus did not engage in taxable intrastate telecommunications business activities during the audit period.

## BACKGROUND

¶ 3 The facts are undisputed. During the audit period of January 1, 1990, through August 31, 1993, Cable Plus operated a satellite master antenna television ("SMATV") service in Arizona. Cable Plus sold its services to the residents of thirteen apartment complexes and one mobile home park.

¶ 4 Quality audio signals and video images cannot travel far on their own. When transmitted from their origin to an orbiting satellite, the audio signals and video images are "piggy-backed" onto a microwave carrier beam. After adjusting the frequency of these signals to prevent interference with incoming signals, the satellite rebroadcasts them to a satellite dish on Earth.

¶ 5 Once received, the passenger signals are removed from the carrier beam and then translated so that they can be assigned to a new carrier signal that allows them to be transported over cable and received by standard television sets. Thus the programming information is transformed from one medium of transmission to another. In our view, the process is not unlike the now archaic practice of translating electrical telegraph signals from Morse code into a written form meaningful to telegram recipients.

¶ 6 Cable Plus installed a satellite receiving dish, a rooftop-mounted broadband UHF/VHF antenna, distribution cabling, and a "headend room" at each of the fourteen properties it serves. Cable Plus received locally-broadcast television signals through the UHF/VHF antennae. Through its satellite dishes, Cable Plus received programming from such sources as HBO, ESPN, CNN, MTV and VH–1. In its headend room at each property, Cable Plus translated the satellite signals into a usable form and assigned them to a new carrier signal for cable transmission to its subscribers' television sets.[1]

1. Cable Plus charged its subscribers only for providing the programming that it received from

its satellite feed, not for the locally broadcast programming incorporated with it.

¶ 7 For the audit period ADOR assessed a total of $57,974.04 in delinquent transaction privilege taxes against Cable Plus,[2] with interest, under the telecommunications classification now defined by A.R.S. section 42–5064.

¶ 8 Cable Plus protested the assessments unsuccessfully before ADOR and appealed to the tax court. On cross-motions for summary judgment, the tax court ruled for Cable Plus. The court reasoned:

> The transaction privilege tax is imposed on revenues from the business of providing intrastate telecommunication services. A.R.S. § 42–1310.04(A) [now A.R.S. section 42–5064(A)]. Intrastate telecommunications services are defined by A.R.S. § 42–1310.04(C) [now A.R.S. section 42–5064(C)] as: 'transmitting signs, signals, writings, images, sounds, messages, data or other information of any nature by wire, radio waves, light waves or other electromagnetic means if the **information transmitted originates and terminates in this state.**' (Emphasis supplied.)
>
> The information transmitted by Plaintiff does not originate in this state; only the termination occurs in this state. The actual production of the information takes place in studios outside of Arizona. This court therefore concludes that the activities from which Plaintiff derives the revenue Defendant is seeking to tax, do not constitute intrastate telecommunication services.

¶ 9 ADOR appeals from the judgment entered by the tax court.

### DISCUSSION

 ¶ 10 This court reviews the interpretations of statutes *de novo. See Rènalwest L.C. v. Arizona Dep't of Revenue,* 189 Ariz. 409, 412, 943 P.2d 769, 772 (1997). We strictly construe tax exemptions. *See id.* When the question is whether the taxing statute reaches the activity scrutinized, however, we liberally resolve ambiguities in favor of the taxpayer. *See State ex rel. Arizona Dep't of Revenue v. Phoenix Lodge No. 708, Loyal Order of Moose, Inc.,* 187 Ariz. 242, 248, 928 P.2d 666, 672 (1996); *Kitchell Con-*

*tractors, Inc. v. City of Phoenix,* 151 Ariz. 139, 143–44, 726 P.2d 236, 240–41 (1986). In doing so we may consider the statute's context, its spirit and purpose, its historical background, its effects and consequences, its language, and its subject matter. *See Phoenix Lodge No. 708,* 187 Ariz. at 248, 928 P.2d at 672.

¶ 11 ADOR argues that Cable Plus is engaging in intrastate communications because the signals that it transmits to its subscribers originate in Cable Plus's in-state headend rooms and terminate at its subscribers' in-state television sets. ADOR correctly points out that Cable Plus electronically processes raw satellite feeds in Arizona so that they may be received and understood on standard television sets and that Cable Plus then transmits these processed signals from its Arizona headend rooms to its Arizona customers.

¶ 12 Contrary to ADOR's analysis on appeal, however, the signals whose intrastate transmission ADOR sought to tax here are not the kind of signals to which A.R.S. section 42–5064(C) refers. The statutory term "signals" must be interpreted in the context in which it appears in section 42–5064(C):

> (C) For purposes of this section, "intrastate telecommunications services" means transmitting signs, signals, writings, images, sounds, messages, data or other information of any nature by wire, radio waves, light waves or other electromagnetic means if the information transmitted originates and terminates in this state.

 ¶ 13 The term signals appears in the context of signs, writings, images, sounds, and data, all of which are varieties of information in and of themselves. In that context, it is clear that the signals whose intrastate transmission the legislature sought to tax are those that are themselves information, like voice or Morse code transmissions or streaming audio and video feeds—in other words, the information content that the ultimate consumer receives and enjoys. The legislature did not intend to tax the signals that are used to make the transmission of

---

2. The income on which the taxes were levied was actually generated by the business activities of DMW Communications, Inc., BSA Communica-

tions, Inc., and WMP Communications, Inc., of which Cable Plus became successor in interest.

information possible, like the carrier signal and other electronic impulses that Cable Plus transmits from its headend rooms to its customers' television sets. Signals of that kind are among the electromagnetic means, including wire, radio waves, and light waves, by which the varieties of information that the statute lists are transmitted from origination to termination.

¶ 14 It is thus the origination point of the information content that determines the applicability of the intrastate telecommunications tax. Here it is undisputed that the "signs, signals, writings, images, sounds, messages, [and] data" comprising the information content for which Cable Plus's customers paid originated exclusively outside Arizona.

¶ 15 Our conclusion is supported by other considerations. Given the nature of modern telecommunications, the use of satellite communications is necessarily a dominating feature of the interstate telecommunications business. Moreover, as ADOR itself notes:

> [T]he information that Cable Plus receives from its cable programmers consists of audio and video signals combined with a carrier signal.... The importance of the new, different carrier signal cannot be discounted. Without it, the baseband signals are useless.

In other words, television programming cannot be transmitted by satellite at all without local electronic reprocessing at the receiving end.

¶ 16 Under ADOR's analysis of A.R.S. section 42–5064, however, an interstate satellite transmission necessarily ends at the satellite dish; the required local reprocessing of the satellite feed initiates a new intrastate transmission from the reprocessing business to its customers. Because this new "intrastate" transmission is the one for which the consumer pays, it is the only component of the transmission from the remote origination point to the end user that generates business income for the Arizona taxpayer. Following ADOR's reasoning, when a satellite is used as the mode of transmission for television programming, no interstate telecommunications business is ever done at all. In this view, transmitting television programming by way of a satellite in an orbit 23,000 miles

above the equator is always an exclusively intrastate business.

¶ 17 ADOR's reasoning ignores the clear legislative implication of A.R.S. section 42–5064. That statute expressly limits the telecommunications classification to "the business of providing *intrastate* telecommunications services." (Emphasis added.) This unmistakably reveals the legislature's understanding that there exists a distinct, complementary business, that of providing interstate telecommunications services, which generates income that the legislature currently chooses not to subject to transaction privilege taxation. Had the legislature intended the result of ADOR's reasoning, it would have simply taxed the business of providing telecommunications services.

¶ 18 ADOR relies on *Capitol Cablevision Corp. v. Hardesty,* 168 W.Va. 631, 285 S.E.2d 412 (1981), as the only authority on point. There the West Virginia business and occupations tax was levied on the proceeds of business activities performed solely within West Virginia. *Id.* at 415. In contrast to A.R.S. section 42–5064, the West Virginia tax applied regardless of whether any given taxpayer's business was linked to or participated in interstate commerce.

¶ 19 The taxpayer in question operated a community antenna television system ("CATV"). *Id.* at 414. It intercepted conventional television broadcast signals, amplified them, and transmitted them to its subscribers along with its own local programming. *Id.* Because the taxpayer's gross receipts derived from business activities that occurred wholly within West Virginia, the court held that the assessment in question did not violate the Commerce Clause. *Id.* at 418. *Capitol Cablevision* provides no authority for ADOR's analysis.

¶ 20 Rather than supporting ADOR's analysis, the court's opinion in *Capitol Cablevision* supports our tax court's view of the intended scope of A.R.S. section 42–5064. The *Capitol Cablevision* court stated:

> While the community antenna television business is in interstate commerce and is an integral part of interstate commerce (citation omitted), it constitutes the last stage of the interstate transmission of the

television signals. It is one continuous interstate transmission to the viewer's television set. . . .

*Id.* at 418 (quoting *TV Pix Inc. v. Taylor,* 304 F.Supp. 459, 463 (D.Nev.1968), *aff'd mem.,* 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970)). The court also stated:

> The service offered by the CATV system operator is not unlike that which the individual viewer renders himself when he erects a television antenna on the roof of his house. The purpose of the activity is not to generate new signals but to increase the ability of the viewer to receive existing signals.

*Id.* at 420; *cf. Golden Triangle Broadcasting, Inc. v. City of Pittsburgh,* 31 Pa.Cmwlth. 547, 377 A.2d 839, 846 (1977), *aff'd,* 483 Pa. 525, 397 A.2d 1147 (1979) ("Whatever occurs in the 'reprocessing,' 'cleaning up,' 'amplifying,' and 'modulating' of the network signal, we are satisfied that it constitutes neither a 'manufacturing' of that signal or of the resulting image that appears on the home television set.").

## CONCLUSION

¶ 21 For the foregoing reasons, we affirm. Because the tax court correctly granted summary judgment for Cable Plus, we need not address the remaining issues raised by the parties.

CONCURRING: REBECCA WHITE BERCH, Presiding Judge, and JAMES B. SULT, Judge.