20 P.3d 1151

**PEOPLE'S CHOICE TV CORPORATION, INC., a Delaware corporation, Plaintiff–Appellee,**

v.

**CITY OF TUCSON, a municipal corporation, an agency of the State of Arizona, Defendant–Appellant.**

No. 1 CA–TX–00–0010.

Court of Appeals of Arizona, Division 1, Department T.

March 1, 2001.

---

Snell & Wilmer, L.L.P., by Janet E. Barton and Barbara Dawson, Phoenix, Attorneys for Plaintiff–Appellee.

Tucson City Attorney, by Thomas J. Berning, City Attorney, David L. Deibel, Senior Assistant City Attorney, Tucson, Attorneys for Defendant–Appellant.

## OPINION

EHRLICH, Judge.

¶ 1 The City of Tucson appeals from a summary judgment for People's Choice TV Corporation ("PCTV") in PCTV's tax court challenge to a Tucson audit assessment. The audit was conducted in accord with the telecommunications services privilege tax imposed by Tucson City Code ("Code") section 19–470.

¶ 2 Tucson presents these questions:

1. Whether the sums on which the City assessed taxes against PCTV under Code section 19–470 constituted gross income from "interstate telecommunications services" protected from municipal transaction privilege taxation by Arizona Revised Statutes ("A.R.S.") section 42–6004(A)(2) (1999, Supp.2000); and

2. Whether Code section 19–470(a)(2)(b) excludes PCTV's gross income from taxation because it does not "relate to transmissions originating in the city and terminating in this state."

¶ 3 PCTV raises as a cross-issue the following question:

Whether the version of Code section 19–470 in effect during the audit period violated the Equal Protection Clauses of the United States and Arizona Constitutions because section 19–470(e) exempted the gross income of taxpayers who transmitted satellite television programming to residential customers by wire or cable while taxing those who provided the same services through microwave carrier signals.

*FACTS AND PROCEDURAL HISTORY*

¶ 4 During the audit period of March 1, 1992, through April 30, 1996, PCTV engaged in the business of providing microwave pay television services to Tucson customers, as it does now. PCTV purchases television programs created by news and entertainment organizations located outside Arizona, such as CNN, ESPN and HBO, receiving this programming from communications satellites at its reception and transmission (head-end) facility outside Tucson's corporate limits. It also receives certain local television broadcast signals. Both the satellite and local broadcast signals are converted at the PCTV facility into video and modulated to a microwave frequency on which it has authority to broadcast programs to its customers.

¶ 5 To enable the reception of the programs, at each customer's location, PCTV installs a microwave antenna and equipment that down-converts PCTV's microwave broadcast to a Channel 3 frequency output the customer can view on the customer's television set and descrambles any encrypted programming for which the customer pays. PCTV also installs a VHF/UHF antenna at each location to permit the customer to view certain local broadcast programs that PCTV does not intercept and retransmit at its head-end facility. As of February 1995, PCTV's installation charge for antennae and equipment was $99.00.

¶ 6 PCTV offers its customers television programming packages that consist of selected groups of satellite and broadcast television channels. None of the packages consists exclusively of local broadcast channels. For the programs, PCTV charges each customer a monthly fee that corresponds to the package the customer chooses. As an example, also as of February 1995, PCTV charged its customers $19.50 per month for its "Basic" package of channels and an additional $6.95 per month each for HBO, Cinemax and the Disney Channel. PCTV also levies a separate, one-time charge for each pay-per-view movie or "special event" the customer orders.

¶ 7 As a result of the tax audit conducted by Tucson, it assessed PCTV telecommunications services privilege taxes and interest totaling $220,178.60. After protesting the assessment and exhausting its administrative remedies, PCTV filed its complaint and notice of appeal in the tax court.

¶ 8 On cross-motions for summary judgment, the tax court ruled for PCTV. It held that A.R.S. section 42–6004(A)(2) "creates a blanket exemption" for a business such as

PCTV from Tucson's telecommunications services privilege taxes:

> Under this statute, the cities may not tax any categories of income of a telecommunication service company as long as the company establishes that it is an "interstate" service.

¶ 9 Tucson then sought our review. On appeal from a summary judgment when the material facts are not in dispute, we review whether the superior court correctly applied the law and whether the successful party was entitled to judgment as a matter of law. *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). When the court's interpretation of a statute is at issue, as it is in this case, our review is *de novo. Cable Plus Co. v. Arizona Dep't of Revenue,* 197 Ariz. 507, 509 ¶ 10, 4 P.3d 1050, 1052 (App.2000); *Blum v. State,* 171 Ariz. 201, 204, 829 P.2d 1247, 1250 (App.1992).

## DISCUSSION

¶ 10 Tucson contends that the legislature never intended the phrase "interstate telecommunications services" in A.R.S. section 42–6004(A)(2) to comprehend the activities of cable or microwave television systems.[1] Rather, it maintains, the statutory prohibition against municipal taxation of interstate telecommunications services does

not prohibit it from taxing PCTV's business income pursuant to Code section 19–470.[2]

¶ 11 Tucson recognizes that the definition of "*intra* state telecommunications services" in A.R.S. section 42–5064 applies to both cable and microwave television systems.[3] It argues, however, that, because the legislature amended section 42–5064 in 1988 and 1992 to remove sales of intrastate telecommunications services by cable television systems and microwave television transmission systems from the tax base, the legislature must not have intended to accord as broad a reach to "intrastate telecommunications services" as the statutory definition of that phrase might indicate. Then, implicitly treating the definition of "telecommunications services" in section 42–5064 as applicable to "telecommunications services" within the meaning of section 42–6004(A)(2), Tucson contends that the prohibition against municipal taxation of "inter state telecommunications services" in section 42–6004(A)(2) therefore is categorically inapplicable to the municipal taxation of cable or microwave television systems.

¶ 12 Tucson buttresses its argument by observing that, in 1991, the legislature amended the predecessor of A.R.S. section 42–6004(A)(2) to extend the municipal tax prohibition to "that portion of telecommuni-

---

1.  "A. A city, town or special taxing district shall not levy a transaction privilege, sales, use or other similar tax on:
    \* \* \*
    "2. Interstate telecommunications services, which include that portion of telecommunications services, such as subscriber line service, allocable by federal law to interstate telecommunications service."

2.  "(a) *Tax Rate.* The tax rate shall be at an amount equal to two (2) percent of the gross income from the business activity upon every person engaging or continuing in the business of providing telecommunication services to consumers within this city.
    \* \* \*
    "(2) Gross income from the business activity of providing telecommunication services to consumers within this city shall include:
    "a. All fees for connection to a telecommunication system.
    \* \* \*
    "c. Fees charged for access to or subscription to or membership in a telecommunication system or network."

3.  "A. The telecommunications classification is comprised of the business of providing intrastate telecommunications services. The telecommunications company classification does not include sales of intrastate telecommunications services by a cable television system ... or by a microwave television transmission system that transmits television programming to multiple subscribers....
    \* \* \*
    "C. For purposes of this section, 'intrastate telecommunications services' means transmitting signs, signals, writings, images, sounds, messages, data or other information of any nature by wire, radio waves, light waves or other electromagnetic means if the information transmitted originates and terminates in this state."
    Adopted as former A.R.S. section 42–1301(11), as amended by 1985 Ariz. Sess. Laws Ch. 298, section 12, and carried over as A.R.S. section 42–5064(C) (1999, Supp.2000).

cation services, such as subscriber line services, allocable by federal law to interstate telecommunication services." 1991 Ariz. Sess. Laws Ch. 28, § 1. It suggests that, because this extension pertained exclusively to telephone services, the legislature necessarily must have regarded cable and microwave television services as being beyond the scope of section 42–6004(A)(2).

¶ 13 Tucson also points out that the legislature recently added a new subsection (10) to A.R.S. section 42–6004(A) that exempts "sales of internet access services" from municipal taxation. 2000 Ariz. Sess. Laws Ch. 397, § 7. From this, it argues that, if PCTV's broad interpretation of section 42–6004(A)(2) were as clear as PCTV contends, no such specific exemption would have been necessary.

¶ 14 We do not accept Tucson's analysis. If the legislature had meant that "telecommunications services" did not include cable and microwave television services, it would have done so directly by amending the definition of "telecommunications services" embodied in A.R.S. section 42–5064, but it did not. Instead, the legislature removed cable and microwave television services from the scope of the tax under section 42–5064. That action, accomplished in stages by separate bills four years apart, strongly suggests that this was all that the legislature intended to do.

¶ 15 Tucson's reliance on the 1991 "subscriber line services" amendment of A.R.S. section 42–6004(A)(2) also is unavailing. The 1991 legislature may well have believed that the circumstances of cable and microwave television services were sufficiently different from those of long-distance telephone services such that no analogous amendment for cable or microwave was appropriate. The record provides no basis for concluding that Tucson's explanation of the amendment is more than its speculation, an insufficient ba-

sis for departing from the text of sections 42–5064 and 42–6004.[4]

¶ 16 PCTV implicitly defends the tax court's view that A.R.S. section 42–6004(A)(2) immunizes from municipal taxation all varieties of business income earned by any telecommunications company engaging in interstate commerce.[5] In its argument, PCTV equates "telecommunications services" as used in sections 42–5064 and 42–6004(A)(2) with "telecommunications services" as used in Code section 19–470 and takes the position that, if PCTV's services are "interstate" in character, section 42–6004(A)(2) necessarily invalidates the tax imposed on it in this case.

■ ¶ 17 PCTV also rejects the idea that its customers subscribe or gain access to or become members in a telecommunications system within the meaning of Code section 19–470(a)(2)(c). It maintains that its customers "pay for transmissions and they receive those transmissions (that programming), which they have contracted to receive." PCTV attaches no significance to the fact that its customers pay the same periodic fees for their programming packages whether they watch all or none of the programs transmitted. Accordingly, it urges:

Tucson's strained and tortured interpretation of the facts perhaps is most evident with respect to the pay-per-view movies that PCTV offers and that its customers can purchase. When a PCTV customer purchases a pay-per-view movie from PCTV, what the customer is paying for is the transmission (the movie) and a telecommunications service (the ability to obtain the movie without having to leave the house to rent it). The customer, just like an individual who buys a ticket and views a movie at a movie theater, is not being provided access to or subscribing to a telecommunications system or network. Nor are PCTV's customers gaining member-

---

4. It adds that, even if A.R.S. section 42–6004(A)(2) applies to cable and microwave television services, the statutory scope is not so broad as to invalidate the particular tax it imposed on PCTV. However, Tucson in fact assessed taxes against PCTV solely pursuant to Code section 19–470(a)(2)(c), which does not tax gross income from "transmissions" but does include within taxable gross income "[f]ees charged for access

to or subscription to or membership in a telecommunication system or network."

5. Tucson in turn states that cable and microwave television companies do not provide "interstate" telecommunications services, an issue resolved against it in *Cable Plus Co.*, 197 Ariz. 507, 4 P.3d 1050.

ship to a telecommunications system or network when they pay PCTV for a single viewing of a pay-per-view movie.

¶ 18 We disagree with the tax court and PCTV that A.R.S. section 42–6004(A)(2) immunizes from municipal taxation all varieties of business income earned by any telecommunications company engaged in interstate business activities. Section 42–6004(A)(2) prohibits municipalities from taxing "interstate telecommunications services . . . ." The only definition of "telecommunications services" provided by Title 42, A.R.S. indeed is the one in the definition of "intrastate telecommunications services" in section 42–5064, which pertains to "transmitting signs, signals, writings, images, sounds, messages, data or other information of any nature by wire, radio waves, light waves or other electromagnetic means . . . ." *Cf. Cable Plus Co.,* 197 Ariz. at 509–10, ¶ 13, 4 P.3d at 1052–53 (Section 42–5064 taxes the "transmission" of "signals."). Statutes regarding the same subject-matter should be interpreted consistently and in harmony with one another. *Goulder v. Arizona Dep't of Transp., Motor Vehicle Div.,* 177 Ariz. 414, 416, 868 P.2d 997, 999 (App.1993), *aff'd,* 179 Ariz. 181, 877 P.2d 280 (1994). Therefore, as do the parties, we consider the definition of "telecommunications services" in section 42–5064 applicable to the same phrase in section 42–6004(A)(2).

¶ 19 Applying that definition necessitates the conclusion that the municipal taxation that A.R.S. section 42–6004(A)(2) precludes is that imposed on interstate "transmissions" of information. Contrary to the thrust of PCTV's argument and the tax court's holding, this prohibition does not encompass the sales of services ancillary to the interstate transmission of signals such as the "sales of internet access services" that section 42–6004(A)(10) brought within the municipal tax prohibition.

¶ 20 Code section 19–470(a) is consistent with this understanding; it imposes taxes on gross income from "providing telecommunication services to consumers within this city." In turn, "providing telecommunication services" is defined as *"any service or activity connected with the transmission or relay* of sound, visual image, data, information, images, or material over a communications channel or any combination of communications channels." Code § 19–100 (emphasis added). This definition comprehends any services that may relate to or accompany the transmission enterprise.

¶ 21 In keeping with that definition, Code section 19–470(a)(2) includes within "telecommunications services" four categories of services. Among them are providing access or subscription to or membership in a telecommunications system, Code § 19–470(a)(2)(c), and providing security-alarm-system monitoring services that transmit or receive signals or data over a communications channel. Code § 19–470(a)(2)(d).

¶ 22 The Phoenix City Code's identical version of section 19–470(a)(2)(d) was considered in *Sonitrol of Maricopa County v. City of Phoenix,* 181 Ariz. 413, 419–20, 891 P.2d 880, 886–87 (App.1994), in which this court held that gross income from the provision of security-alarm monitoring services was not exempt from the Phoenix telecommunication services tax as charges for interstate transmissions. We reasoned that the Phoenix exemption for interstate transmissions was inapplicable because Phoenix City Code section 19–470(a)(2)(d), like the Tucson City Code, did not tax transmissions but, rather, charges for security-alarm monitoring services using communications channels.

¶ 23 The same analysis applies to "fees charged for access to or subscription to or membership in a telecommunication system or network" within Code section 19–470(a)(2)(c). Like the section governing security-alarm monitoring services, Code § 19–470(a)(2)(d), the section pertaining to telecommunications system access, subscription or membership, Code § 19–470(a)(2)(c), does not tax "transmissions" at all; it taxes the provision of services that use telecommunication. Accordingly, Code section 19–470(a)(2)(c) does not impose a prohibited tax on "interstate telecommunications services" within the meaning of A.R.S. section 42–6004(a)(2).

¶ 24 Thus, PCTV is mistaken in characterizing its services as the equivalent of transmissions, Tucson's taxation of which would be

prohibited by A.R.S. section 42–6004(A)(2). This is illustrated by the fact that, with one discrete exception discussed below, PCTV's customers do not pay separately for the transmission of each program viewed. Instead, the customers pay flat monthly fees for the permission and ability to watch their choice of the programming contained in packages that PCTV makes available. These fees are the same no matter how much or little of the programming the PCTV customers watch. In common English usage, PCTV's customers are paying "subscription" fees for "access to" or "membership in" the telecommunications system by which PCTV makes its services and programming packages available. As Tucson notes, a number of the cases on which PCTV itself relies employ this common usage: *United States v. Southwestern Cable Co.*, 392 U.S. 157, 162, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)("CATV systems commonly charge their subscribers installation and other fees."); *Capitol Cablevision Corp. v. Hardesty*, 168 W.Va. 631, 285 S.E.2d 412, 414 (1981)("Capitol's revenues were derived principally from subscription and installation fees paid by individual viewers. . . ."); *Cable Plus Co.*, 197 Ariz. at 508 n. 1, 4 P.3d at 1051 n. 1 ("Cable Plus charged its subscribers only for providing the programming that it received from its satellite feed. . . .").

¶ 25 The exception, of course, is PCTV's pay-per-view charges for selected movies and special events. PCTV analyzes those charges as if they were qualitatively indistinguishable from the monthly charges, implicitly citing them as a paradigm for its business charges as a whole.

¶ 26 Far from supporting its position, however, PCTV's analysis of its pay-per-view charges highlights the weakness of its claim that it charges no subscription or access fees at all. Instead, PCTV's analysis makes clear that its pay-per-view charges are the only true instances of charges that it makes for "transmissions." The remainder of PCTV's revenues flow from installation charges and

periodic charges for access to the programming packages to which its customers subscribe. These revenues no more constitute charges for "transmissions" than did those for the security alarm monitoring services considered in *Sonitrol.*[6] Section 42–6004(A)(2) of the Arizona Revised Statutes did not preclude imposition of the telecommunications services tax pursuant to Code section 19–470(a)(2)(c) on PCTV's business income.

¶ 27 PCTV's contention that its business income is excluded from taxation pursuant to Code section 19–470(a)(2)(b) likewise is unpersuasive. That section provides:

(2) Gross income . . . shall include:

\* \* \*

b. Toll charges, charges for transmissions, and charges for other telecommunications services *provided that such charges relate to transmissions originating in the city and terminating in this state.*

(Emphasis added.) Because PCTV's transmissions to its customers emanate from a source outside Tucson, PCTV argues that this income is not subject to tax pursuant to Code section 19–470(a)(2)(b).

¶ 28 PCTV is wrong because Tucson has not sought and does not seek to tax PCTV for "transmissions" pursuant to Code section 19–470(a)(2)(b). It has assessed taxes against PCTV only according to Code section 19–470(a)(2)(c): "Fees charged for access to or subscription to or membership in a telecommunication system or network." The proviso in Code section 19–470(a)(2)(b) leaves wholly undisturbed the addition to taxable gross income effected by Code section 19–470(a)(2)(c).

■ ¶ 29 During the audit period, Code section 19–470 included a subsection (e), which exempted from the telecommunications services tax "cable televisions systems" as defined in A.R.S. section 9–505 (1996). PCTV, which did not operate a cable televi-

---

**6.** Before the tax court, PCTV did not request that pay-per-view charges as such be excluded from its tax base. Its position was that A.R.S. section 42–6004(A)(2) precluded municipal taxation of any its business income without regard to dis-

tinctions among different income categories. We therefore do not consider whether PCTV is entitled to a refund of the assessed taxes attributable to its pay-per-view charges on the theory that the levy violated section 42–6004(A)(2) to that extent.

sion system within the meaning of section 9–505, contends as a cross-issue in support of the judgment that this exemption violated its right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article 2, Section 13 of the Arizona Constitution.[7] PCTV maintains that there exists no rational basis for treating pay television companies differently solely on the basis of the medium by which they distribute entertainment signals.

¶ 30 An equal protection challenge to a legislative tax classification can succeed only if the taxpayer can demonstrate that the classification is not rationally related to any conceivable legitimate governmental purpose. A legislative classification may be based on rational speculation unsupported by evidence or empirical data, and will survive rational basis review unless the court is convinced beyond a reasonable doubt that the legislative classification is wholly unrelated to any legitimate legislative goal. The burden is on the challenging party to demonstrate that there is no conceivable basis for the disparity in treatment.

*US West Commun., Inc. v. City of Tucson,* 198 Ariz. 515, ¶ 40, 11 P.3d 1054, 1064–65 (App.2000) (citations omitted). The burden is on the party challenging the statute to negate every conceivable basis that might support it. *Heller v. Doe by Doe,* 509 U.S. 312, 320–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

¶ 31 PCTV fails to convince us that former Code section 19–470(e) lacked a rational relationship to any conceivable legitimate governmental purpose. The Tucson City Council which adopted Code section 19–470(e) may have believed that it was in the public interest to encourage the expansion of cable television in Tucson to a greater extent than microwave television. The Council also may have believed that the franchise fees to which cable television providers are subject in Tuc-

son, *US West,* 198 Ariz. at 518, ¶ 2, 11 P.3d at 1057, were adequate to compensate the city for the use of its public rights-of-way and that exempting cable television providers from the tax under Code section 19–470 was an appropriate step toward tax equity. We cannot find that imposition of the tax on PCTV pursuant to Code section 19–470(a)(2)(c) during the audit period violated its equal protection rights.

### CONCLUSION

¶ 32 The tax court judgment is reversed and remanded with directions to enter judgment for Tucson.[8]

CONCURRING: JEFFERSON L. LANKFORD, Judge, ANN A. SCOTT TIMMER, Judge.

---

7. Arizona Constitution, Article 2, Section 13 has "the same effect as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution." *Phoenix Newspapers, Inc. v. Purcell,* 187 Ariz. 74, 77, 927 P.2d 340, 343 (App.1996).

8. Because we reverse and remand for entry of judgment in favor of Tucson, the award of attorneys' fees to PCTV as the prevailing party pursuant to A.R.S. section 12–348(B) also must be reversed. We therefore need not consider whether the tax court abused its discretion in its award of fees to PCTV.