229 P.3d 1020

**CITY OF PEORIA, a municipal corporation; and City of Phoenix, a municipal corporation, Plaintiffs/Defendants/Appellees,**

v.

**BRINK'S HOME SECURITY, INC., a Delaware corporation, Defendant/Plaintiff/Appellant.**

**No. 1 CA–TX 09–0001.**

Court of Appeals of Arizona, Division 1, Department T.

April 29, 2010.

As Corrected June 23, 2010.

Stephen M. Kemp, City Attorney, Peoria City Attorney's Office By Cynthia Odom, Assistant City Attorney, Peoria, Attorneys for Plaintiff/Defendant/Appellee Peoria.

Gary Verburg, City Attorney, Phoenix City Attorney's Office By James H. Hays, Assistant City Attorney, Phoenix, Attorneys for Plaintiff/Defendant/Appellee Phoenix.

Snell & Wilmer LLP By Barbara J. Dawson, Martha E. Gibbs, Melissa M. Krueger, Phoenix, Attorneys for Defendant/Plaintiff/Appellant.

## OPINION

BARKER, Judge.

¶ 1 This is a transaction privilege tax case. Brink's Home Security, Inc. ("Taxpayer") appeals the grant of summary judgment requiring it to pay municipal transaction privilege taxes on the revenue it receives from monitoring security systems installed in Phoenix and Peoria households. Finding no genuine dispute of material fact or legal error, we affirm the judgment.

*Facts and Procedural History*

### 1. Taxpayer's Business

¶ 2 Taxpayer is a Delaware corporation in the business of providing alarm monitoring systems. It offers a variety of devices for home installation, including glass break detectors, heat sensors, master control panels, key pads, motion detectors, and water sensors.

¶ 3 Following installation of Taxpayer's home security system, the customer signs a monitoring contract with a three-year minimum term requiring monthly payments. Customers are liable for the monthly monitoring fee even if they never activate the system during the contract term.

¶ 4 Once a disturbance occurs in the monitoring sensors, which may be triggered by water, smoke, fire, or an intruder, a siren sounds and information is transmitted to the master control panel in the Phoenix or Peoria residence. The master control panel holds the information for thirty seconds so that the homeowner can disarm the system by in-home communication if it was accidentally triggered. The only exception is for certain fire and emergency issues.

¶ 5 If the customer does not cancel the alarm, a message travels by a local land line for an unknown distance and then is publicly switched to one of two long-distance carriers, AT & T or Southwestern Bell. The information then proceeds as a WATS call, via circuits Taxpayer leases from these carriers, to Taxpayer's central monitoring station in Texas. Taxpayer requires customers to have a local land line in order to activate the monitoring process. Taxpayer does not separately charge for calls to Texas that are triggered when a sensor is tripped or activated.

¶ 6 The human monitor in Texas then implements Taxpayer's protocols by calling the customer or a designated contact. The monitoring information and process ends in Peoria or Phoenix,[1] either at the customer's

---

1. Taxpayer also sells and installs monitoring equipment and provides services not only in Phoenix and Peoria but also throughout Arizona. It also repairs monitoring devices in these customers' homes.

request or by a call to the local police department.

### 2. *This Litigation*

¶ 7 Peoria and Phoenix customers pay Taxpayer a flat monthly monitoring fee following installation of security systems in their homes. Taxpayer does not pay transaction privilege tax to any jurisdiction based upon gross income earned from security or burglar alarm service charges billed to Phoenix and Peoria customers.

¶ 8 After an account review, the Cities of Peoria and Phoenix assessed transaction privilege taxes against Taxpayer pursuant to Peoria City Code § 12–470(a)(2)(D) and Phoenix City Code § 14–470(a)(2)(D). Peoria assessed taxes of $5,968.29 for the January 1999 to December 2003 audit period; Phoenix assessed $169,912.33 for the December 1998 to October 2004 audit period.

¶ 9 Taxpayer protested Phoenix's and Peoria's assessments. Following a consolidated hearing, the hearing officer resolved the protests in Taxpayer's favor. The hearing officer concluded that Arizona Revised Statutes ("A.R.S.") section 42–6004(A)(2) (2006) precluded taxation of gross income earned from the alarm monitoring system business in Phoenix and Peoria. He then referred Taxpayer to the cities' respective Problem Resolution Officers for resolution of its attorneys' fee claims under Phoenix City Code § 14–578 and Peoria City Code § 12–578. Both officers denied the fee requests.

¶ 10 Peoria and Phoenix appealed on the merits to the Arizona Tax Court,[2] while Taxpayer appealed the denial of its fee requests.[3] The tax court consolidated the complaints, and the parties filed cross-motions for summary judgment.

¶ 11 After oral argument, the tax court granted summary judgment to Peoria and Phoenix and upheld the denial of attorneys' fees to Taxpayer. Taxpayer appealed, challenging both the ruling on the merits and the denial of attorneys' fees at the administrative and tax court levels.

*Discussion*

### 1. *Taxpayer's Activities Are Subject to Transaction Privilege Tax Under the Phoenix and Peoria City Codes.*

¶ 12 This court reviews the tax court's grant of summary judgment *de novo.* *Wilderness World, Inc. v. Ariz. Dep't of Revenue,* 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). We likewise review *de novo* the tax court's construction of statutes and its findings that combine fact and law. *Ariz. Dep't of Revenue v. Ormond Builders, Inc.,* 216 Ariz. 379, 383, ¶ 15, 166 P.3d 934, 938 (App. 2007).

¶ 13 The issue on appeal is whether Taxpayer's monitoring service is subject to the transaction privilege tax. Arizona law grants cities broad authority to impose transaction privilege taxes. A.R.S. § 9–240(B)(18), (26) (2008); *see Centric–Jones Co. v. Town of Marana,* 188 Ariz. 464, 467–71, 937 P.2d 654, 657–61 (App.1996). Both Peoria and Phoenix have adopted the Model City Tax Code § 470 provision on transaction privilege taxes. *See* Peoria City Code § 12–470; Phoenix City Code § 14–470. These sections provide in relevant part:

> (a) The tax rate shall be ... upon every person engaging or continuing in the business of providing telecommunication services to consumers within this City.
>
> . . . .
>
> (2) Gross income from the business activity of providing telecommunication services to consumers within this City shall include:
>
> . . . .
>
> (D) Charges for monitoring services relating to a security or burglar alarm system located within the City where such system transmits or receives signals or data over a communications channel.

Peoria City Code § 12–470(a)(2)(D); Phoenix City Code § 14–470(a) (2)(D). The cities' codes further define "[t]elecommunication [s]ervice" as "any service or activity connected with the transmission or relay of sound,

---

2. *See* A.R.S. §§ 12–123 (2003), –163 (2003 & Supp.2009); Peoria City Code § 12–575; Phoenix City Code § 14–575.

3. *See* Peoria City Code § 12–578(c); Phoenix City Code § 14–578(c).

visual image, data, information, images, or material over a communications channel or any combination of communications channels." Peoria City Code § 12–100; Phoenix City Code § 14–100. A "[c]ommunications [c]hannel" is defined as "any line, wire, cable, microwave, radio signal, light beam, telephone, telegraph, or any other electromagnetic means of moving a message." Peoria City Code § 12–100; Phoenix City Code § 14–100.

¶ 14 Taxpayer contends it is exempt from the transaction privilege tax pursuant to A.R.S. § 42–6004(A)(2) because it supplies *interstate* telecommunications services. Section 42–6004(A)(2) prohibits cities from levying a transaction privilege tax on "[i]nterstate telecommunications services, which include that portion of telecommunications services, such as subscriber line service, allocable by federal law to interstate telecommunications service." A.R.S. § 42–6004(A)(2) (Supp.2009). Because our legislature has not provided us with a definition of interstate telecommunications services, we look to the statutory definition of intrastate telecommunication services. If the service qualifies as "intrastate," by definition it could not be "interstate." Our statutes state: " '*Intrastate telecommunications services*' *means transmitting* signs, signals, writings, images, sounds, messages, data or other *information of any nature* by wire, radio waves, light waves or other electromagnetic means *if the information transmitted originates and terminates in this state.*" A.R.S. § 42–5064(E)(4) (Supp.2009) (emphasis added). Thus, if the transmission of information begins and ends in Arizona, it is intrastate, not interstate.

¶ 15 Taxpayer contends the imposition of the transaction privilege tax is inappropriate because each step of the monitoring service is a separate interstate telecommunications transmission. We disagree.

¶ 16 Our courts have had occasion to interpret § 42–6004(A)(2). In *People's Choice TV Corp., Inc. v. City of Tucson,* 202 Ariz. 401, 46 P.3d 412 (2002), the taxpayer received local and out-of-state programs at its facility outside Tucson and used microwave frequencies to transmit the programs to its customers in Tucson. *Id.* at 402, ¶ 2, 46 P.3d at 413. Customers, after paying a fee, received the programming through microwave antennae installed by taxpayer. *Id.* The court of appeals upheld the city's imposition of the transaction privilege tax on taxpayer because it "interpreted § 42–6004(A)(2) as prohibiting only the taxation of interstate ' "transmissions" ' of information, not the taxation of the 'services ancillary to the interstate transmission of signals.' " *Id.* at 403, ¶ 6, 46 P.3d at 414. The court of appeals found taxpayer was being taxed on the provision of services using telecommunication and accordingly the tax was not on "interstate telecommunications services" as prohibited by § 42–6004(A)(2). *Id.* In reversing and declining to adopt the court of appeals' interpretation of § 42–6004(A)(2), the Arizona Supreme Court stated "[w]e believe the phrase 'interstate telecommunications services' requires a more expansive meaning than the court of appeals gave it when interpreting § 42–6004(A)(2)." *Id.* Our supreme court held it was not just "transmissions" that needed to be included in the phrase "interstate telecommunications services" but also the services that were provided. *Id.* at 403, ¶ 8, 46 P.3d at 414.

¶ 17 Here, Taxpayer asks us to accept a narrow, restricted interpretation of "*intrastate* telecommunications services" under A.R.S. § 42–5064(E)(4) similar to the one rejected by the supreme court in *People's Choice* with regard to "*interstate* telecommunications services" under § 42–6004(A)(2). Taxpayer characterizes its service as three separate interstate telecommunications transmissions: (1) Arizona to Texas to alert Taxpayer, (2) Texas to Arizona to alert customer, and (3) Texas to Arizona to alert authorities. This is no different than the overly narrow distinctions the court of appeals adopted, and the supreme court rejected, as to microwave transmissions and ancillary services in providing television service in *People's Choice.*

¶ 18 *People's Choice* is also consistent with Phoenix's and Peoria's code definition of "telecommunication service." As noted earlier, that definition refers to "any service or activity *connected* with the transmission ... of ... information." Peoria City Code § 12–

100 (emphasis added); Phoenix City Code § 14–100 (emphasis added). Thus, the definition itself is broader than "a transmission" and includes the service or activity "connected with" a transmission. *Id.* Further, and importantly, the definition refers to both the singular "a communications channel" or, in the plural, *"any combination* of communications *channels." Id.* (emphasis added). The fact that a different "communication channel" is utilized for the return transmissions from Texas to Arizona is expressly included in the definition of "telecommunication service."

¶ 19 Viewing Taxpayer's service as three distinct interstate transmissions does not comport with the "more expansive meaning" of "telecommunications services" from *People's Choice* or the definition of "telecommunication service" in Peoria City Code § 12–100 and Phoenix City Code § 14–100. Taxpayer's service, viewed in its entirety, is a telecommunication service loop that begins in Arizona and ends in Arizona. Without a home alarm triggered in Arizona, the calls from Arizona to Texas and back to Arizona would not occur. That Taxpayer's monitoring facility is located outside Arizona has no impact on the intrastate telecommunication service bargained to begin and end in Arizona. No one in Peoria or Phoenix purchased an alarm monitoring system that began a transmission in Arizona and ended in Texas. The "telecommunication services" that Arizona residents bargained for, and Taxpayer agreed to provide, was a transmission loop that began with an alarm in their home in Arizona and ended (if the alarm was valid) with notification to a police department in Arizona. Otherwise, Taxpayer's monitoring service would not provide the purchased service.

¶ 20 Taxpayer's own characterization of its services acknowledges that its services "could not exist but for" this loop between Arizona and Texas and back to Arizona again:

The facts demonstrate that Brink's business of monitoring security systems could not exist but for (a) the sending of electronic signals from a monitor panel at the customers' locations in Peoria and Phoenix to Brink's Texas Monitoring Facility, (b) the call placed by Brink's monitoring professionals at the Texas Monitoring Facility to the customer's home in Phoenix or Peoria to verify the nature of the trouble, and (c) the call by Brink's monitoring professionals at the Texas Monitoring Facility to notify the appropriate authorities in Arizona of the emergency. All of those communications occur via interstate telecommunications transmittals.

This theme, of a loop between Arizona and Texas and back again, is the central thrust of Taxpayer's position: "[W]ithout the electronic transmissions that flow across state lines (1) between Arizona and Texas and then (2) between Texas and Arizona, there would be no 'telecommunication services.'" *Reply Brief* at 1. "Put another way, there are no electronic signals that stay within Arizona; all signals involved in the monitoring process—which is what is subject to tax—flow across state lines from Arizona to Texas or from Texas to Arizona." *Id.* at 5. We reject Taxpayer's assertion that it is solely interstate, rather than intrastate, either because of a human component or "because it involves sending electronic signals from Arizona to Texas via one transmission and then, via two additional, independent transmissions, sending electronic signals from Texas to Arizona." Far from "independent," once Taxpayer made the choice to place a human monitor in Texas, this loop of information transmitted from Arizona to Texas and back again is required, and the return transmissions are *completely dependent upon* an originating transmission in Arizona. Taxpayer could have placed the human monitor in Tucson, Arizona, or Bangalore, India, and the loop of information from Arizona to the monitoring location and back again would still be required.

¶ 21 Accordingly, the definition of "intrastate telecommunications services" in § 42–5064(E)(4) applies: "the information transmitted originates and terminates in this state." Section 42–6004(A)(2) does not preclude the tax because Taxpayer is providing intrastate telecommunication service.[4]

4. Taxpayer also argues it is exempt from the   transaction privilege tax under Peoria City Code

## 2. The Tax Does Not Violate the Commerce Clause.

¶ 22 Taxpayer further claims that the transaction privilege taxes violate the United States Constitution's Commerce Clause and supply an independent ground for reversing the tax court. *See* U.S. Const. art. I, § 8 ("The Congress shall have Power ... [t]o regulate Commerce ... among the several States...."). We review de novo the application of the constitutional provision to these facts. *Egan v. Fridlund–Horne,* 221 Ariz. 229, 232, ¶ 8, 211 P.3d 1213, 1216 (App.2009).

¶ 23 As explained previously, a single activity may be comprised of both interstate and intrastate components. *McCaw v. Fase,* 216 F.2d 700, 705 (9th Cir.1954); *Beard v. Vinsonhaler,* 215 Ark. 389, 221 S.W.2d 3, 3–4 (1949). Both components may be subject to tax depending upon the circumstances. *Goldberg v. Sweet,* 488 U.S. 252, 263–64, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279–81, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) (defining modern dormant Commerce Clause principles).

¶ 24 In *Goldberg,* the United States Supreme Court analyzed a five percent excise tax on gross charges of interstate telephone calls originated or terminated in the state and charged to an Illinois service address, as well as on intrastate calls. 488 U.S. at 256, 109 S.Ct. 582. The service provider challenged the tax as violative of the Commerce Clause. *Id.*

¶ 25 The *Goldberg* Court observed that "the path taken by the electronic signals is often indirect and typically bears no relation to state boundaries." *Id.* at 255, 109 S.Ct. 582. The decision confirmed that even a state or local taxing authority may impose transaction privilege taxes on the interstate activities of a telecommunications provider without violating federal law if it satisfies four tests. *Id.* at 257, 109 S.Ct. 582. The tests are: (1) the taxpayer has a substantial nexus with the city or state; (2) the tax is

fairly apportioned; (3) the tax does not discriminate against interstate commerce, and (4) the tax is fairly related to the taxpayer's activities and presence in the city or state. *Id.* at 257, 109 S.Ct. 582 (citing *Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076).

### A. Taxpayer Has a Substantial Nexus with Phoenix and Peoria.

¶ 26 The *Goldberg* parties agreed that a substantial nexus existed between Illinois and the telecommunications reached by the relevant statute. *Id.* at 260, 109 S.Ct. 582. Likewise, Taxpayer has not contended that it lacks a substantial nexus with Phoenix and Peoria.

### B. The Phoenix and Peoria Taxes Are Fairly Apportioned.

¶ 27 In *Goldberg,* the taxpayer argued that the Illinois tax was not fairly apportioned because it taxed the gross charge of each telephone call. *Id.* at 260, 109 S.Ct. 582. In lieu of imposing an apportionment formula, the Court determined whether the tax was internally and externally consistent. *Id.* at 261, 109 S.Ct. 582. A tax is internally consistent if no multiple taxation would result from identical taxes and externally consistent if the taxing authority taxes only that portion of the revenue from the local activity that reasonably reflects the local component of that activity. *Id.* at 261–62, 109 S.Ct. 582. Further, "the threat of real multiple taxation ... may indicate a State's impermissible overreaching." *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 185, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995), *superseded by statute on other grounds,* 49 U.S.C. § 14505 (2004), *as recognized in Tri–State Coach Lines, Inc. v. Metro. Pier & Exposition Auth.,* 315 Ill.App.3d 179, 247 Ill.Dec. 805, 732 N.E.2d 1137, 1146–47 (2000).

¶ 28 The Phoenix and Peoria taxes satisfy both parts of this test. The taxes are internally consistent because, assuming each

§ 12–470(c) and Phoenix City Code § 14–470(c). These provisions exempt levying a tax on "[c]harges by a provider of telecommunication services for transmissions originating in the City and terminating outside the State." As we dis-

cussed with regard to A.R.S. § 42–6004(A)(2), the transmissions at issue here begin and end in Arizona. Thus, our analysis of § 42–6004(A)(2) applies to § 470(c).

taxing jurisdiction had a tax similar to those of Phoenix and Peoria, each taxing jurisdiction would tax only the revenues for customers owning homes within its jurisdiction. *See Goldberg,* 488 U.S. at 261–63, 109 S.Ct. 582. The taxes are externally consistent because Phoenix and Peoria each tax only the portion of revenues that reasonably reflects the in-city component of the activity being taxed. *See id.* As in *Goldberg,* the taxes are already apportioned because they are imposed only on customers in the respective cities. *See id.*

¶ 29 Relying on *Southern Pacific Transportation Co. v. Arizona Department of Revenue,* 202 Ariz. 326, 44 P.3d 1006 (App.2002), Taxpayer contends that the taxes do not satisfy the external consistency test. That case is factually distinguishable. Arizona sought to tax a train traveling between Arizona and New Mexico as though it traveled solely in Arizona. *Id.* at 329, ¶¶ 2–6, 44 P.3d at 1009. Here, as described above, all the activity being taxed related to the transmission of information from Arizona to Texas and back again.

¶ 30 Another problem for Taxpayer is that *Goldberg* specifically distinguishes telecommunications businesses from other types of businesses, including transportation businesses like those in *Southern Pacific.* Whereas trains make identifiable movements in a state, the movement of electronic impulses through computer networks proceeds along intangible routes. *Goldberg,* 488 U.S. at 264–65, 109 S.Ct. 582. Trying to track these intangible routes would pose "insurmountable administrative ... barriers." *See id.* The *Goldberg* Court therefore upheld the Illinois tax. *See id.* Similarly, apportionment already exists in this case. Taxpayer reports, and Phoenix and Peoria tax, income generated from bills Taxpayer sends to local customers for security alarm monitoring that begins and ends in Arizona.

### C. The Phoenix and Peoria Taxes Do Not Discriminate Against Interstate Commerce.

¶ 31 The taxes also do not discriminate against interstate commerce. In

*Goldberg,* the Court rejected the argument that the municipal tax disproportionately burdened interstate telecommunications. *Id.* at 265–66, 109 S.Ct. 582. Moreover, by upholding the tax, all monitoring companies share the tax burden equally irrespective of whether the phone bank is somewhere in Arizona or elsewhere. Indeed, were we not to uphold the tax on Taxpayer, businesses with Arizona monitoring stations monitoring Arizona homes would be placed at a competitive disadvantage.

### D. The Phoenix and Peoria Taxes Are Fairly Related to Taxpayer's Activities and Presence.

¶ 32 Finally, the taxes are fairly related to the activities and presence of Taxpayer in Phoenix and Peoria. Taxpayer has set up substantial business operations and availed itself of the attendant benefits. The taxes Peoria and Phoenix assessed relate only to gross income earned from charges for security or burglar alarm services billed to Peoria and Phoenix customers.[5] The imposition of these local tax burdens is equitable.

### 3. Taxpayer Is Not Entitled to Attorneys' Fees.

¶ 33 Taxpayer applied for attorneys' fees pursuant to Peoria City Code § 12–578 and Phoenix City Code § 14–578. Under those provisions, a Taxpayer Resolution Officer has discretion to award attorneys' fees to the prevailing taxpayer when a city's position is "not substantially justified" and the taxpayer prevails as to the most significant issue or set of issues. Peoria City Code § 12–578(a); Phoenix City Code § 14–578(a). The Tax Court reversed the Tax Resolution Officer's ruling in favor of Taxpayer on the applicability of the tax, and we affirm that ruling. Accordingly, there is no basis for fees for Taxpayer.

### Conclusion

¶ 34 We affirm the grant of summary judgment in all respects and affirm the denial of

---

5. Taxpayer attempts to distinguish *Goldberg* as a sales tax case, not a transaction privilege tax case, but the effort is unavailing. *Goldberg* applies *Complete Auto,* which construed Mississip-

pi's tax on "'the privilege of doing business' within the State." *Complete Auto,* 430 U.S. at 274, 97 S.Ct. 1076.

Taxpayer's request·for attorneys' fees. In addition, we deny Taxpayer's request for attorneys' fees in this appeal and in the tax court pursuant to A.R.S. § 12–348(A)(1) and (B)(1) (2003).

CONCURRING: MAURICE PORTLEY, Judge.

JOHNSEN, dissenting.

¶ 35 I respectfully dissent because in my view, A.R.S. § 42–6004(A)(2) bars the Cities from imposing transaction privilege taxes on income Taxpayer receives for performing its home-security monitoring services.

### 1. The Transmissions by Which Taxpayer Performs Its Monitoring Services Are Interstate Telecommunications.

¶ 36 As set forth in the majority's decision, A.R.S. § 42–6004(A)(2) provides that a city "shall not levy a transaction privilege ... tax on [i]nterstate telecommunications services, which include that portion of telecommunications services, such as subscriber line service, allocable by federal law to interstate telecommunications service." Although our legislature has not defined "interstate telecommunications services," like the majority, I understand that if a communication constitutes an intrastate telecommunication, it is not an interstate telecommunication. *See supra* ¶ 14. More specifically, because "intrastate telecommunications services" means "transmitting ... information ... if the information transmitted originates and terminates in this state," *see* A.R.S. § 42–5064(E)(4), if the information transmitted by telecommunication does not "originate and terminate" within the state, the transmission must constitute an interstate transmission, which A.R.S. § 42–6004(A)(2) states the Cities may not tax.

¶ 37 According to the record, the triggering of an alarm in the home of one of Taxpayer's customers causes three telecommunications transmissions. In the first transmission, the security system automatically contacts a facility in Texas manned by employees that Taxpayer calls "monitoring professionals." The purpose of this first transmission is to alert Taxpayer that a customer's home alarm has been triggered. The second transmission occurs when a "monitoring professional" in Taxpayer's facility in Texas telephones the customer to alert the customer to the alarm. During this conversation, Taxpayer's employee determines whether the alarm is false or whether there is reason to contact authorities. The third transmission then occurs: When appropriate, depending on the preceding conversation with the customer, the monitoring employee places an emergency call to summon first responders to the customer's home.

¶ 38 Unlike the majority, I conclude these communications are three distinct transmissions, not three segments of a single transmission. The automated transmission uses telephone connections to deliver information from Arizona to Texas; the other two transmissions are telephone calls that in my mind are no different in kind than any other telephone calls placed from Texas to Arizona. Just as A.R.S. § 42–6004(A)(2) would not permit a city to impose a transaction privilege tax on fees a telephone provider receives for calls placed between Arizona and Texas and vice versa, the statute does not permit a city to tax the monitoring services Taxpayer provides by way of those telephone transmissions.

¶ 39 Although the majority relies on *People's Choice,* in my view there is little in that case or in any other Arizona decision that guides our analysis of whether the telecommunications at the heart of Taxpayer's business are intrastate communications or interstate communications. Interpreting A.R.S. § 42–6004(A)(2), *People's Choice* held the statute does not permit imposition of transaction privilege taxes on the gross income from sales, tolls, subscriptions and subscriber services received by a business engaged in interstate telecommunications. The question in that case, however, was not what *interstate telecommunications* means, but whether a transaction privilege tax may be imposed on income a business engaged in interstate communications receives in access or subscriber fees. The city in that case argued that it taxed not the "actual transmissions" by the business but only the fees the

business charged subscribers for access to the service. *People's Choice*, 202 Ariz. at 402–03, ¶ 4, 46 P.3d at 413–14. Citing A.R.S. § 42–5064(B), our supreme court held § 42–6004(A)(2) precludes imposition of a transaction privilege tax on such a business's gross income from sales, tolls, subscriptions and subscriber services. *Id.* at 404, ¶ 8, 46 P.3d at 415.

¶ 40 It was in this context that the supreme court held that "the phrase 'interstate telecommunications services' requires a more expansive meaning." *Id.* at 403, ¶ 6, 46 P.3d at 414. The *People's Choice* court did not address the issue presented here, which is whether certain transmissions are *interstate* telecommunications or *intrastate* telecommunications. The taxpayer in *People's Choice* received television programming by satellite and transmitted that programming to its customers over microwave frequencies. *Id.* at 402, ¶ 2, 46 P.3d at 413. The program packages the taxpayer sold its customers contained "both local and out-of-state programs." *Id.* Nevertheless, without analysis, the court observed that like other cable television businesses, the taxpayer "primarily provide[d] interstate programming." *Id.* at 404, ¶ 10, 46 P.3d at 415.

¶ 41 In *Cable Plus Co. v. Arizona Department of Revenue*, 197 Ariz. 507, 4 P.3d 1050 (App.2000), this court addressed whether a television company engaged in interstate or in intrastate telecommunications when it broadcast to Arizona subscribers programs it received via satellite. Reasoning that under those circumstances, it was "the origination point of the information content that determines the applicability of the intrastate telecommunications tax," we concluded the taxpayer in that case was engaged in interstate telecommunications because the programming it broadcast originated exclusively outside the state. *Id.* at 510, ¶ 14, 4 P.3d at 1053.

¶ 42 Of course we do not deal here with transmissions of television programs such as were at issue in *People's Choice* and *Cable Plus*. The first of the three transmissions involved in Taxpayer's monitoring services may be akin to the television programming at issue in *People's Choice* or *Cable Plus* in that

it is a packaged message (i.e., a home alarm has been triggered at a particular address). But the pair of telephone calls that follow are in the ordinary course different in kind. They are not transmissions of pre-packaged information but *conversations* in which persons located in two different states exchange information (i.e., Taxpayer to customer: "Are you all right?" Customer: "I think I heard an intruder and I'm hiding under my bed—please call for help.") or instructions (i.e., Taxpayer to first responders: "We've received an alarm at such-and-such address. Please respond to the home. The homeowner is present and hiding under the bed awaiting you.")

¶ 43 Viewed in this manner, it seems to me that these exchanges are simple telephone calls that are not subject to municipal transaction privilege taxation because they are interstate communications, made from one state to another. In the language of the statute, they are not transmissions of information that both "originates and terminates in this state." A.R.S. § 42–5064(E)(4). The first transmission is effectively an automated call for help sent from Arizona to Texas. The second two transmissions are conversations in which Taxpayer offers to perform and performs services for the customer from whose home the electronic call for assistance originated. Suppose the taxpayer in this case were a concierge service located in Texas that offered quick long-distance help to customers with travel plans or restaurant deliveries. Arizona residents could call this company, for example, to arrange to have a rental car brought to their home or to have a restaurant in North Phoenix deliver a meal. In my hypothetical scenario, as in this case, the out-of-state taxpayer performs services for customers in Arizona via telephone calls placed in one state and received in another. I do not think it could be argued that my hypothetical taxpayer was engaged in intrastate telecommunications, and I think the same is true with respect to the Taxpayer in this case. The majority argues that while the monitoring service necessarily begins with a transmission from Arizona, Taxpayer's "monitoring professionals" could be located anywhere. *Supra* ¶ 20. True enough, but

the fact is that they are not located in Arizona, and my view is that as a result, telecommunications to them from customers in Arizona and from them to customers and first responders in Arizona necessarily are interstate in nature.

¶ 44 I also believe the majority's conclusion that the three transmissions that occur after a home alarm is triggered constitute a "single loop" disregards that, as described above, the three telephone calls at issue do not transmit the same information. While the initial automated transmission contains a simple alert that an alarm has been triggered, the two transmissions that follow are conversations that include the fact that an alarm has been triggered but which also necessarily include a give and take of other information concerning what action should be taken as a result of the alarm.

¶ 45 The Cities argue, however, that A.R.S. § 42–6004(A)(2) prohibits them from taxing only interstate telecommunications services that federal law treats as interstate telecommunications. They base this argument on the language of the statute, which states:

A city ... shall not levy a transaction privilege, sales, use or other similar tax on:

\* \* \* \*

2. Interstate telecommunications services, which include that portion of telecommunications services, such as subscriber line service, allocable by federal law to interstate telecommunications service.

The Cities' contention is misguided. The legislature's use of the word "include" in this context means that what follows is among the services that are excluded from taxation, or a partial list of the services that are excluded. See Black's Law Dictionary 777 (8th ed.2004) ("include" means "[t]o contain as a part of something"; "*including* typically indicates a partial list"); *Security Sav. & Loan Ass'n v. Milton,* 171 Ariz. 75, 77, 828 P.2d 1216, 1218 (App.1991) (because "include" is "ordinarily a

term of enlargement, not of limitation," "it is generally improper to ... conclude that items not specifically enumerated are excluded").[6]

### 2. The Object of the Tax Is Telecommunications.

¶ 46 Finally, I briefly address an issue the majority is not required to resolve, which is the Cities' argument that their imposition of transaction privilege taxes on Taxpayer does not implicate A.R.S. § 42–6004(A)(2) because they are taxing monitoring services, not telecommunications. The Cities argue Taxpayer's business for the most part is not really the monitoring it performs via telecommunication transmissions from Texas, but instead, is the alarm system Taxpayer installs in its customers' homes or even the signs and decals it gives its customers to place in their yards and on their homes to warn potential intruders to stay away.

¶ 47 As our supreme court said in *People's Choice,* however, when a taxpayer is in the business of interstate telecommunications, A.R.S. § 42–6004(A)(2) not only precludes taxing that taxpayer's telecommunication services; it also precludes taxing its related services, as well. 202 Ariz. at 404, ¶ 8, 46 P.3d at 415. Because the in-home equipment and other security system trappings that Taxpayer provides its customers would be useless without the monitoring that Taxpayer performs from Texas, the relevant focus is on the telecommunications services that Taxpayer performs, not on the equipment or the "show" of a security system that Taxpayer also provides its customers. Indeed, as Peoria argues (in another context in this appeal), "the 'heart and soul' of the monitoring business is getting the information about the event to the homeowner and the local police and fire departments."

¶ 48 This conclusion is consistent with the Model City Tax Code, which taxes home security companies as providers of telecommunications services. As recited *supra* ¶ 13,

---

6. That a comma precedes the "which include" clause drives home the legislature's intent that telecommunications services allocable by federal law as interstate services simply are among those services to which the exclusion applies. *See* Chi-

cago Manual of Style ¶ 6.36 (15th ed.2003) (dependent clause following a main clause "should *not* be preceded by a comma if it is restrictive, that is, essential to the meaning of the main clause").

§ 14–470(a)(2)(D) of the Model City Tax Code provides that the "[g]ross income from the business activity of providing telecommunication services to customers within this City shall include ... [c]harges for monitoring services relating to a security or burglar alarm system located within the City where such system transmits or receives signals or data over a communications channel." *See* Peoria City Code § 12–470(a)(2)(D); Phoenix City Code § 14–470(a)(2)(D); *see also* Peoria City Code § 12–100 and Phoenix City Code § 14–100 (defining "telecommunication service" to mean "any service or activity connected with the transmission or relay of information ... over a communications channel").[7]

### 3. Conclusion.

¶ 49 For these reasons, I would reverse the tax court and hold that the Cities' imposition of transaction privilege taxes on Taxpayer's income received from customers in Peoria and Phoenix violates A.R.S. § 42–6004(A)(2). I also would direct reimbursement of Taxpayer's attorney's fees on the ground that the Cities' position in this matter was "not substantially justified." *See* Peoria City Code § 12–578(a); Phoenix City Code § 14–578(a).

---

**7.** Neither City argues that transaction privilege taxes are due from Taxpayer on any amounts a customer pays to have monitoring equipment installed in the home.